9 Cal.3d 185 (1973)
507 P.2d 956
107 Cal. Rptr. 68
THE PEOPLE, Plaintiff and Respondent,
v.
MICHAEL DAMIEN MILAN, Defendant and Appellant.
Docket No. Crim. 15377.
Supreme Court of California. In Bank.
March 28, 1973.
*188 COUNSEL
Elliot E. Stanford, under appointment by the Supreme Court, for Defendant and Appellant.
Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and William R. Pounders, Deputy Attorney General, for Plaintiff and Respondent.
OPINION
BURKE, J.
Michael Milan was found guilty by a jury of first degree murder of Keith Burney, kidnaping Burney for the purpose of robbery with *189 bodily harm, first degree robbery of Burney, attempted murder of Horace Robert, and first degree robbery of Raymond Lester. The jury fixed the penalty at death for the murder and at life imprisonment without possibility of parole for the kidnaping, and the court imposed prison sentences for the other crimes.[1] A motion for a new trial was denied, and defendant's automatic appeal is now before us. (Pen. Code, § 1239, subd. (b).)
Defendant contends that the court erred in admitting certain evidence, in instructing the jury, and in denying his challenge to the petit jury panel. We have concluded that none of the contentions can be upheld. However, the judgment must be modified to provide for a penalty of life imprisonment instead of death for the murder in accord with our holding in People v. Anderson, 6 Cal.3d 628 [100 Cal. Rptr. 152, 493 P.2d 880]. (See also Furman v. Georgia, 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726].)[2] Certain modifications of the judgment are also required as a result of the proscription in Penal Code section 654 against multiple punishment. We affirm the judgment as hereinafter modified.
After 8 p.m. on April 15, 1970, Horace Robert, a cab driver, and Keith Burney, a cab-driver-trainee who was riding as a passenger in the front seat, picked up defendant at Marie's Bar in Bell Gardens. Defendant stated that he wanted to go to Redondo Beach, and, after a discussion regarding the fare, they started towards that destination.
They stopped twice en route so that defendant could get matches at a liquor store and attempt to use a restroom. At the second stop it was possibly 9 p.m. According to Robert, at neither stop did defendant stagger or walk in an unusual manner. Robert further testified that he never smelled alcohol on defendant's breath and that during conversations defendant seemed to make sense and his words were not slurred.
After defendant was in the cab 30 minutes or so Robert heard a click that sounded like the shifting of an automatic weapon and on glancing back saw defendant holding a gun against the back of Burney's head. Defendant *190 stated not to do "anything stupid." Robert continued driving in the same general direction and after pushing a button to transmit the conversation said "We'll take you wherever you want to go. We're in Manhattan Beach and you have the gun." He then, in an attempt to attract the attention of the police, went through a stop sign, which was about eight or ten blocks from the place he heard the click. When Robert went through the sign, defendant shifted the gun to the back of Robert's head, said "that was stupid," shot a hole in the windshield and told Robert that the next one would be in the back of his head and to "stop looking for stop signs, and if a police vehicle shows up, you're dead." Robert nevertheless continued to try to get the attention of the police by committing additional traffic violations, including going through two or three more stop signs, speeding at possibly 40 miles an hour, and going through a red traffic signal.
During a conversation defendant stated, inter alia, that he "wanted no witnesses" and that Robert and Burney would be found dead the next morning. Defendant eventually directed Robert to turn down a street and stop. They were then in a residential section with narrow streets and many parked cars. Robert stopped in the middle of the street but defendant directed him to back against the curb. There was a small sidewalk there adjacent to a high hedge and overhanging tree. Defendant told Burney to give him his wallet and keys, and Burney complied. Defendant then asked for Robert's money, but Robert replied that he did not have any. While they were parked at this location, a man parked in front of them and got out of his car. He subsequently looked in the direction of the cab and then reentered his car. Defendant then told Robert to drive off, and Robert did so.
They made one or two additional stops. One stop was four or five blocks from the first stop. At the last stop defendant told Robert to get out and empty his pockets on the car hood. As defendant began to get out of the car, Robert alighted and ran down the street. He heard four shots but succeeded in reaching a house where he sought help.
The police were called, and Robert accompanied the officer to the location where he last saw the cab, but it was no longer there. Later that same night they found the cab parked under a carport in an alley at the rear of an apartment building in Manhattan Beach. Burney's body was in the driver's seat of the cab. It was stipulated that the cause of his death was a gunshot wound of the head.
A resident of the apartment building heard a bang from the carport about 9:45 that night. A couple of minutes later he heard two more bangs, which sounded like gunshots. On looking out he saw a man who appeared *191 to be carrying a gun. The man walked briskly out of the carport and toward the beach; he swayed or slouched forward in an abnormal manner. The resident also noticed a cab in the carport and on looking inside saw a man slumped over the steering wheel. The resident thereupon summoned the police.
Shortly before 10 that same night defendant entered Ercole's Cafe, which was in the same neighborhood as the apartment building behind which Burney's body was found. Defendant ordered a drink, but the bartender, Raymond Lester, refused to serve him because the way he walked in and sat down "didn't seem right." Defendant appeared to be in a hurry and was not steady, and the bartender thought defendant might have had a drink or so, although defendant's speech was not slurred and the bartender did not conclude that defendant was intoxicated. After a while defendant showed the bartender a gun and told him to fill a bag defendant was carrying with money. The bartender obtained money and checks drawn by customers from the cash registers and put them in defendant's bag. Defendant left after threatening the bartender, and the police were then called.
On the same night Officer Mebius saw defendant walking along the street several blocks from Ercole's Cafe and observed that he fit the description broadcasted of the robber of that cafe. Mebius and several other officers who arrived on the scene placed defendant under arrest. On defendant's person they found, among other things, a gun, a bag containing $309 in currency, the checks taken in the robbery at Ercole's Cafe, and a key that activated the ignition to the cab in which Burney's body was found.
A search of the cab and surrounding area revealed four spent cartridges. An officer concluded on the basis of tests he performed that these cartridges had been fired from the gun that was found on defendant's person. The officer further testified that the bullet recovered from the deceased's body could have been fired from the same gun but was so mutilated that he could not form an absolute opinion that it had been fired from that gun.
Defendant, testifying in his own behalf, stated: During the day and early evening on April 15, 1970, he consumed specified alcoholic beverages and Librium pills. After having some drinks at Marie's Bar he asked a cab driver to take him to Redondo Beach. They stopped at a liquor store where he bought some whiskey, which he consumed in the cab. He remembered being angered at the cab driver for going through a stop sign. *192 He recalled the driver tried to run and he shot at him and missed. The next thing he remembered was the police grabbing him. He had no recollection of asking Burney or Robert for their wallets, telling them he was going to kill them, or of shooting Burney. Defendant admitted on cross-examination having previously been convicted of armed robbery and receiving and concealing stolen property.
In rebuttal Officer Dutchess, who had custody of defendant on the night of the arrest for about three hours, testified that, although defendant had an odor of alcohol on his breath and appeared to be lightly "under the influence," defendant did not appear drunk, appeared to know what he was doing, and had no problem walking or conversing. Officer Skay, who participated in defendant's arrest, similarly testified that defendant was not under the influence of alcohol. Skay did not smell an odor of alcohol on defendant.
No claim is made, or properly could be, that defendant's act in compelling Burney to be transported around in Manhattan Beach under the circumstances heretofore recited did not amount to conduct proscribed by Penal Code section 209 as we construed it in People v. Daniels, 71 Cal.2d 1119, 1139 [80 Cal. Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677]. Under the Daniels test brief movements of the victim that "are merely incidental to the commission of the robbery" and that "do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself" do not come within section 209.
People v. Timmons, 4 Cal.3d 411, 414-415 [93 Cal. Rptr. 736, 482 P.2d 648], stated that the increased likelihood that the victim would be robbed is not "what we meant in Daniels (at p. 1139 of 71 Cal.2d) when we spoke of movements which `substantially increase the risk of harm' beyond that inherent in the underlying crime. [Fn. omitted.] Rather, we intended to refer to an increase in the risk that the victim may suffer significant physical injuries over and above those to which a victim of the underlying crime is normally exposed.... The true test ... is not mere mileage but whether the movements of the victims `substantially increase the risk of harm' beyond that inherent in the crime of robbery itself." As an example of such an increase in the risk of harm, Timmons pointed to People v. Ramirez, 2 Cal. App.3d 345 [82 Cal. Rptr. 665], wherein the defendant and a cohort accosted their intended rape victim at 2:30 a.m. in a factory parking lot and dragged her into their car, and during an ensuing chase by a police patrol car the vehicle operated by defendant's cohort "took an erratic course," and finally crashed, killing the cohort. According to Timmons, Ramirez reasoned that "`the manner *193 of the detention and movement substantially increased the risk of harm to [the victim] over and above that necessarily incident to the crime of rape  the risk being so great that the driver of the car met his death as a result.'"
Timmons further stated that "In sharp contrast, here [the victims] simply drove their own car for some five blocks along a city street in broad daylight, while Timmons accomplished the robbery and proceeded to the rendezvous with his accomplice. The police were not in hot pursuit, and there was no highspeed chase and consequent reckless driving. On the contrary, it was to Timmons' advantage that the car be driven as innocuously as possible so as to attract no attention from passersby. Neither victim observed any weapon in Timmons' possession, and the court found he was not armed.... [N]either victim suffered any harm whatever." Timmons concluded that in the circumstances the brief asportation cannot be said to have "substantially" increased the risk of harm beyond that inherent in the commission of the robberies.
(1) Here, unlike Timmons, the driver of the vehicle observed a gun in defendant's hand; defendant held the gun against the alleged kidnap victim's head while the car was in motion, at times shifted the gun to the driver's head, and on one occasion fired a bullet through the windshield; the victim was transported considerably more than five blocks; the driver repeatedly committed traffic violations in an attempt to attract the attention of the police; and the alleged kidnaping was during the evening. In these circumstances the jury was warranted in finding that the asportation substantially increased the risk of harm beyond that inherent in the crime of robbery.[3] The asportation gave rise to dangers, not inherent in robbery, that a traffic collision would occur and that as a result of the motion of the car the gun would accidentally discharge. The fact that neither of these dangers materialized, of course, does not mean that the risk of harm was not substantially increased by the asportation.
The evidence is also sufficient to support the jury's findings that the kidnaping was for the purpose of robbery, that the victim suffered bodily harm, and that defendant was guilty of the other crimes of which he was convicted. Defendant makes no argument to the contrary but seeks to have the judgment reversed on the following grounds:

Asserted Error in Admitting Evidence
Four photographs, two of which are in color, were admitted over objection on the ground that their sole purpose was to inflame the jury. Three *194 of the photographs show the deceased's bloodstained body slumped down in the cab, and the fourth shows his head with blood around his ear and face.
Defendant argues on appeal that the court erred in admitting the photographs since, assertedly, they are gruesome and lack probative value. He points to the fact that the parties stipulated as to the cause of death and that the defense presented was diminished capacity.
The facts pointed to, however, do not deprive the photographs of probative value. (2) The photographs are relevant to show the circumstances of the crime (People v. Conley, 64 Cal.2d 310, 326 [49 Cal. Rptr. 815, 411 P.2d 911]; People v. Reese, 47 Cal.2d 112, 119-120 [301 P.2d 582] [disapproved on other grounds in People v. Morse, 60 Cal.2d 631, 649 (36 Cal. Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810)]), and constitute circumstantial evidence of malice (People v. Brawley, 1 Cal.3d 277, 295 [82 Cal. Rptr. 161, 461 P.2d 361]; People v. Arguello, 65 Cal.2d 768, 776 [56 Cal. Rptr. 274, 423 P.2d 202]; People v. Harrison, 59 Cal.2d 622, 627-628 [30 Cal. Rptr. 841, 381 P.2d 665]). It has repeatedly been held to be within the trial court's discretion to determine whether the probative value of such exhibits outweighs their prejudicial effect. (People v. Salas, 7 Cal.3d 812, 819 [103 Cal. Rptr. 431, 500 P.2d 7]; People v. Terry, 2 Cal.3d 362, 403 [85 Cal. Rptr. 409, 466 P.2d 961]; People v. Brawley, supra; People v. Bradford, 70 Cal.2d 333, 341-342 [74 Cal. Rptr. 726, 450 P.2d 46].) Although the photographs are unpleasant to view, it cannot be said that the court abused its discretion in admitting them.

Asserted Errors in Instructions
(3) Defendant contends that the court erred in instructing the jury that "It is not necessary that all jurors agree in the determination that there was a deliberate and premeditated design to take the life of the deceased, or in the conclusion that the defendant was at the time engaged in the commission of robbery, or an attempt to commit one; it is sufficient that each juror is convinced beyond a reasonable doubt that the defendant committed the crime of murder in the first degree as that offense is defined." Defendant cites no authority supporting his contention, and we are not persuaded that we should depart from our prior decisions which support the giving of the instruction. In People v. Nye, 63 Cal.2d 166 [45 Cal. Rptr. 328, 403 P.2d 736] [cert. den. 384 U.S. 1026, 1027 (16 L.Ed.2d 1033, 86 S.Ct. 1960)] this court reaffirmed its holding in People v. *195 Chavez, 37 Cal.2d 656, 670-672 [234 P.2d 632], that in a prosecution for first degree murder it is not necessary that all jurors agree on one or more of several theories proposed by the prosecution; it is sufficient that each juror is convinced beyond a reasonable doubt that the defendant is guilty of first degree murder as that offense is defined by the statute. (See also People v. Hardenbrook, 48 Cal.2d 345, 353-354 [309 P.2d 424].) A similar rule has been applied in burglary cases (People v. Failla, 64 Cal.2d 560, 569 [57 Cal. Rptr. 103, 414 P.2d 39]) and theft cases (People v. Nor Woods, 37 Cal.2d 584, 586 [233 P.2d 897]; People v. Kagan, 264 Cal. App.2d 648, 661 [70 Cal. Rptr. 732] [cert. den. 394 U.S. 911 (22 L.Ed.2d 224, 89 S.Ct. 1027)]; People v. Caldwell, 55 Cal. App.2d 238, 255-256 [130 P.2d 495].)
Defendant further contends that instructions on the felony-murder rule should not have been given because, he asserts, the killing and robbery of Burney did not constitute one continuous transaction. He argues that the robbery was "completed after the cab was parked at the curb ... for at that point ... Burney gave the defendant his wallet and keys" and that the killing was separated in time and place from the robbery. However, "the crime of robbery is not confined to the act of taking property from victims. The nature of the crime is such that a robber's escape with his loot is just as important to the execution of the crime as obtaining possession of the loot in the first place. Thus, the crime of robbery is not complete until the robber has won his way to a place of temporary safety. (People v. Anderson, 64 Cal.2d 633, 638 ...; People v. Ketchel, 59 Cal.2d 503, 523-524....)" (People v. Carroll, 1 Cal.3d 581, 585 [83 Cal. Rptr. 176, 463 P.2d 400].) (4) Here the jury was warranted in concluding that defendant had not won a place of temporary safety when he shot Burney. Accordingly, the court did not err in giving instructions on the felony-murder rule. (See People v. Salas, supra, 7 Cal.3d 812, 820-824; People v. Ketchel, supra [disapproved and judgment vacated on other grounds in People v. Morse, supra, 60 Cal.2d 631, and People v. Ketchel, 63 Cal.2d 859 [48 Cal. Rptr. 614, 409 P.2d 694]]; People v. Kendrick, 56 Cal.2d 71, 89-90 [14 Cal. Rptr. 13, 363 P.2d 13]; People v. Chapman, 261 Cal. App.2d 149, 175 [67 Cal. Rptr. 601].)

Challenge to Petit Jury Panel
Defendant challenged the petit jury panel on the ground that excusing from jury service persons for whom it would be an economic hardship to *196 serve for $5 a day [the amount authorized for jurors' fees (see Pen. Code, § 1143)] deprived him of a cross-section of the community.
The sole witness called by the defense was the jury commissioner who testified: If a prospective juror made an affidavit to the effect that it would be an economic hardship for him to serve for $5 a day he was excused. People in certain occupations (e.g., salesmen who receive solely a commission) habitually fill out such affidavits. It has been his experience that people who are not covered by contracts providing for payment during jury service and who do not have outside income are unable to serve for $5 a day. He is not authorized to pay above that amount.
Defendant argued in the trial court that few can live on $5 a day without outside income and that excusing persons for whom it would be a hardship to serve for that amount left a jury composed of the wealthy, the retired, housewives, and those covered by contracts providing for payment during jury service.
The trial court denied the challenge, and defendant argues on appeal that the court thereby erred. He cites Thiel v. Southern Pacific Co., 328 U.S. 217 [90 L.Ed. 1181, 66 S.Ct. 984, 166 A.L.R. 1412], but his reliance upon that case is misplaced. Thiel involved a federal jury from which daily wage earners were intentionally and systematically excluded, and the United States Supreme Court held that in the exercise of its power of supervision over the administration of justice in federal courts the defendant's motion to strike the jury panel should have been granted. In the instant case persons were excused from serving on the ground of economic hardship and not because they were daily wage earners. Thiel expressly recognized that "a federal judge would be justified in excusing a daily wage earner for whom jury service would entail an undue financial hardship." (P. 224 [90 L.Ed. at p. 1186].) Similarly, it is permissible for a jury commissioner to excuse a prospective juror on the ground of such hardship. (People v. Gibbs, 12 Cal. App.3d 526, 538 [90 Cal. Rptr. 866]; see also People v. Hess, 104 Cal. App.2d 642, 666-670 [234 P.2d 65] [app. dism. for want of substantial fed. question, 342 U.S. 880 (96 L.Ed. 661, 72 S.Ct. 177)].) (5) The court did not err in denying defendant's challenge. (See People v. Gibbs, supra, 12 Cal. App.3d 526, 538-539.)

Multiple Punishment
(6) Defendant may not be punished for both the kidnaping of Burney for the purpose of robbery with bodily harm and the murder of Burney which was the indivisible culmination of the infliction of bodily harm, as *197 was impliedly recognized by the trial court when it pronounced the judgment. (Pen. Code, § 654; People v. Carter, 56 Cal.2d 549, 565 [15 Cal. Rptr. 645, 364 P.2d 477]; cf. People v. Chessman, 52 Cal.2d 467, 495-496 [341 P.2d 679] [disapproved on another issue in People v. Morse, supra, 60 Cal.2d 631, 649]; People v. Langdon, 52 Cal.2d 425, 435 [341 P.2d 303]; People v. Chessman, 38 Cal.2d 166, 193 [238 P.2d 1001] [disapproved on another issue in People v. Daniels, supra, 71 Cal.2d 1119, 1139].) (7) As stated at the outset, we must reduce defendant's penalty on the murder count to life imprisonment. Since that punishment is less severe than defendant's penalty of life imprisonment without possibility of parole on the kidnaping count, its execution must be stayed (see People v. Beamon, 8 Cal.3d 625, 639-640 [105 Cal. Rptr. 681, 504 P.2d 905]) and the kidnaping penalty heretofore stayed by the trial court must go into effect.
(8, 9) Nor may defendant be punished for both the kidnaping of Burney for the purpose of robbery and the robbery of Burney since both crimes were committed pursuant to a single intent and objective, namely the robbery of Burney. (See, e.g., People v. Beamon, supra, 8 Cal.3d 625, 639; In re Ward, 64 Cal.2d 672, 676 [51 Cal. Rptr. 272, 414 P.2d 400]; Neal v. State of California, 55 Cal.2d 11, 19 [9 Cal. Rptr. 607, 357 P.2d 839]; People v. Paxton, 255 Cal. App.2d 62, 73 [62 Cal. Rptr. 770] [disapproved on another issue in People v. Tribble, 4 Cal.3d 826, 832 (94 Cal. Rptr. 613, 484 P.2d 589)]; People v. Gomez, 252 Cal. App.2d 844, 860 [60 Cal. Rptr. 881] [disapproved on another issue in People v. Tribble, supra].) As the penalty for robbery is less severe than that imposed for kidnaping for the purpose of robbery, execution of the sentence on this robbery count must also be stayed. (See People v. Beamon, supra.)
(10) The attempted murder of Robert and the robbery of Lester constituted crimes of violence against persons other than Burney and therefore are proper subjects of separate sentences. (In re Ford, 66 Cal.2d 183, 184 [57 Cal. Rptr. 129, 424 P.2d 681]; In re Wright, 65 Cal.2d 650, 656 [56 Cal. Rptr. 110, 422 P.2d 998]; People v. Ridley, 63 Cal.2d 671, 678 [47 Cal. Rptr. 796, 408 P.2d 124]; Neal v. State of California, supra, 55 Cal.2d 11, 21; see People v. Bauer, 1 Cal.3d 368, 377-378 [82 Cal. Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398].)

Conclusion
The judgment is modified to provide a punishment of life imprisonment on the murder count. The stay of the execution of the sentence of life imprisonment without possibility of parole on count 5 (the kidnaping *198 count) is set aside. Execution of the sentences on the murder count and on count 3 (robbery of Burney) is stayed pending service of sentence on count 5, such stay to become permanent when service of sentence on count 5 is completed. As so modified the judgment is affirmed.
Wright, C.J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.
McCOMB, J.
I concur in the opinion, except that, for the reasons expressed in my dissenting opinion in People v. Anderson, 6 Cal.3d 628, 657 [100 Cal. Rptr. 152, 493 P.2d 880], I dissent from that part of the modification of the judgment that provides a punishment of life imprisonment instead of death on the murder count. (See Cal. Const., art. I, § 27.)
NOTES
[1] Execution of the sentence for the kidnaping was stayed, apparently because of the proscription in Penal Code section 654 against multiple punishment. Execution of the sentence for the robbery of Burney was not stayed.
[2] "Although the electors at the November 7, 1972, General Election adopted Proposition 17 which added section 27 to article I of the Constitution purporting to nullify Anderson's holding of the invalidity of the death penalty, the constitutional prohibitions against ex post facto laws (U.S. Const., art. I, § 10; Kring v. Missouri (1882) 107 U.S. 221 [27 L.Ed. 506, 2 S.Ct. 443]; Cal. Const., art. I, § 16) preclude the application of the amendment to cases arising before its effective date (see Const., art. IV, § 1)." (People v. Murphy, 8 Cal.3d 349, 352, fn. 2 [105 Cal. Rptr. 138, 503 P.2d 594].)
[3] The instructions given informed the jury regarding the Daniels test of kidnaping.