[No. D001428. Fourth Dist., Div. One. Dec. 18, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH MORGAN MARSH, Defendant and Appellant.

**COUNSEL**

Robison D. Harley, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and John W. Carney, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**WORK, J.**—Kenneth Morgan Marsh appeals a judgment convicting him of the second degree murder of his girlfriend's two-year-old son, alleging the evidence is insufficient to sustain the verdict, the jurors were prejudiced by being allowed to view inflammatory autopsy photographs, instructional errors, an improper reference to his prior robbery conviction, the court's

erroneous refusal to allow him to present evidence regarding his rehabilitation and improper admission of evidence of his prior conviction for the purpose of impeachment. Although we find the court erred by not permitting Marsh to present facts relevant to his rehabilitation after the prior felony conviction so as to diminish or negate the impeaching value of that conviction as to his credibility as a witness or his present tendency to commit violent acts, admitting certain autopsy photographs, and instructing the jurors they could consider Marsh's failure to explain or deny certain evidence, we find the cumulative effect of these errors harmless under the circumstances of this case and affirm the judgment.

## Factual Background

Marsh resided with his girlfriend, her two-and-one-half-year-old son who was the victim in this case, and her one-and-one-half-year-old daughter. In accordance with family routine, Marsh was babysitting the two children the morning the child received multiple, fatal head injuries in the living room of the home. There was no massive depressed skull fracture or scalp laceration, limiting the cause of brain damage to the head's direct contact with a blunt object accompanied by force equivalent to a high-speed automobile crash or fall from a great height. There was an undepressed fracture of the left parietal bone (directly above the left ear) which may or may not have preexisted. There were also significant lacerations on the back of the neck on the left side, the largest approximately an inch and a half deep and two inches long. This appeared to be a "slash" injury and there were two parallel less deep similar lacerations. These lacerations were too deep and too cleanly cut to have been caused by falling against the brick fireplace hearth near where the victim's body was found. An autopsy revealed multiple severe trauma sites on the face and head; one to the back of the head, at least one on the left side of the head, one on the top of the head, one on the area behind the right ear and a less severe one at the tip of the chin. (The latter could have been caused during resuscitation efforts.) Excluding the chin trauma, the evidence showed no single fall could produce the remaining four impacts to the head.

The lacerations could have been made by shards of glass. Remnants of broken glass from a candy dish were found in the room near the victim's body. Marsh claims the children broke the dish while he was momentarily out of the room. These pieces were examined and found to be large enough to have caused the lacerations in question.[1] However, had they done so they

---

[1] The longest pieces of broken glass had been removed before witnesses arrived so no independent observation of the location and configuration of the broken glass at the injury site was possible.

would have been bloodstained because the deep penetrating large wound lacerated several minor arteries and veins. Both the prosecution and defense experts who examined the glass fragments found no evidence of blood. The consensus of the numerous medical experts was that the lack of significant blood flow from the deep lacerations made it medically likely they were inflicted after the child was essentially brain dead, and not simultaneously with the head blows.

## OVERWHELMING SUBSTANTIAL EVIDENCE SUPPORTS THE JUDGMENT

█ We review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence, reasonably credible and of solid value, such that a reasonable trier of fact could find Marsh guilty beyond a reasonable doubt. (*People* v. *Green* (1980) 27 Cal.3d 1, 55 [164 Cal.Rptr. 1, 609 P.2d 468].) The above facts show the verdict is overwhelmingly supported. The opinions of the medical experts unanimously ruled out accidental death. By Marsh's own admission he was the only person present who could have administered the repeated blows to the child's head with the force described. The absence of embossing or indentations of bricks on the victim's skin or glass debris in the deep lacerations is additional evidence the injuries did not occur when the child fell on broken glass on the hearth.

## EVIDENCE OF MARSH'S PRIOR CONVICTION WAS PROPERLY ADMITTED

█ The court did not err in admitting evidence of Marsh's prior robbery conviction to impeach his credibility as a witness or, by way of cross-examination, to impeach his character witnesses who stated he is "very kind, loving, gentle, and patient with children." The trial court correctly characterized the type of trait described by Marsh's character witnesses as akin to "antiviolence" or "peacefulness." Correctly describing robbery as an assaultive-type crime directly relevant to the character trait of nonviolence, the court allowed Marsh's character witnesses to be questioned as to whether they were aware of this earlier conviction. Although this use would not allow the prosecution to actually prove the conviction, its impact on the jury is no less prejudicial than if it were proved and introduced solely to impeach Marsh's credibility.

Although the trial court did not accurately divine the Supreme Court's later holding in *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111] (that Evid. Code, § 352 survived Proposition 8), its failure to evaluate the prejudicial effect of introducing evidence of the prior conviction is nonprejudicial because the prosecution was otherwise entitled to

ask Marsh's character witnesses about his or her knowledge of the prior to impeach their opinions.

Further, Marsh contends he did not actually suffer a prior conviction for impeachment purposes because he was never incarcerated for that crime but was instead placed on probation, successfully completed it, and was allowed to withdraw his plea of guilty, enter a not guilty plea and have the record expunged. (Pen. Code, § 1203.4.) ▌ Even if there were merit in Marsh's contention, and we see none, it is of little use on this appeal. The prejudice of which he complains arose when the jury was told he engaged in an armed robbery. This information would be received through cross-examination of his character witnesses. Labeling that criminal activity felonious adds little prejudicial effect to its impact on the jury. Although the People do not respond to this issue, the error, if any, is harmless under the most liberal standard of review. ▌ Further, this objection was never raised to the trial court and is deemed waived.

### The Trial Court Was Not Required to Tell the Jury It Must Unanimously Agree on Which Act Constituted Murder

Marsh contends the court had a *sua sponte* duty to instruct the jury that the jurors must unanimously agree on the act or acts which constituted the murder. (CALJIC No. 17.01.) Marsh, however, accompanies this assertion with an unreasonable interpretation of the evidence. He notes there were "several different impact sites. Some of the impact sites were the result of blunt-force trauma to the head while others appeared to be caused by a sharp instrument such as a knife." However, the sole cause of death was the blunt-force trauma to the head. The several impact sites on the head contributing to death were inflicted in a single furious episode of battering. It is this single battering which is the cause of death. ▌ Thus, there was no need for the court to instruct on CALJIC No. 17.01.

### It Was Error to Tell the Jury It Could Draw Adverse Inferences From Marsh's Failure to Explain or Deny Evidence Against Him

The trial court gave CALJIC No. 2.62 advising the jurors they may consider Marsh's failure to explain or deny any prosecution evidence which he could reasonably have been expected to deny or explain because of facts within his knowledge, as tending to indicate the truth of such evidence and that among the inferences reasonably to be drawn therefrom those unfavorable to Marsh were the most probable. The instruction cautioned that it would be unreasonable to draw unfavorable inferences if it found Marsh did not have the knowledge needed to deny or explain the evidence, and that

Marsh's failure to deny or explain evidence against him does not create a presumption of guilt or by itself warrant an inference of guilt. It is error to give this instruction in the absence of evidence in the People's case which is within the defendant's particular knowledge to explain and to which no explanation is offered. (*People* v. *Saddler* (1979) 24 Cal.3d 671, 683 [156 Cal.Rptr. 871, 597 P.2d 130].)

When urging the trial court to give the above instruction over Marsh's objection, the prosecutor was asked to support the instruction. He stated, "I just feel that the evidence clearly shows that there had—from the facts of the case it could not possibly have happened the way he said, and I think an adverse inference may be drawn from his statement that there was no bleeding, there was no blood in the house . . . ." At best, this refers to the fact several medical experts observing the child at the hospital or after his death hypothesized there should have been substantial bleeding from the neck lacerations, and that it appeared the amount of blood on the towel, the child's pants and the carpet did not account for the expected amount of bleeding. However, the experts also stated the amount of blood flow would be relative to the blood pressure which could be affected by the child's condition relating to shock following the blows to the head which were sufficient to cause immediate fatal brain damage. Further, Marsh testified there was not extensive bleeding and that a folded towel was placed, compress-like under the wound as the child lay on the floor. The paramedics testified the observed bleeding was not abnormal when they arrived. Whatever the reason for the possible conflict between the medical experts' after-the-fact opinion and the lack of additional evidence of blood flow at the scene, there is no evidence Marsh failed to explain or deny any matters pertaining to this fact. The prosecutor did not argue to the jurors that Marsh failed to explain or deny any facts within his knowledge.

For the first time, the People argue on appeal about Marsh's "failure to explain the lack of blood at or near the injury site and, in conjunction with this, the child's missing T-shirt." However, there is no direct evidence of blood spill at the injury site in excess of that identified by the witnesses. In any event, Marsh's statement that there was no other blood directly responds to the medical experts' hypotheses. Further, the evidence does not establish Marsh knew anything about the victim's missing T-shirt and does not even conclusively establish one is missing. Certainly, the trial prosecutor made no issue of this supposed fact. ■ There is no support for the instruction and it was error to give it. The error here is harmless (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]) because the death occurred from blows to the child's head, which could not have been sustained by any kind of a fall or a trauma independent of deliberate battering by the sole adult person present. Marsh is that person.

## The Trial Court Erred in Denying Marsh's Offer to Prove He Had Been Rehabilitated Following His Robbery Conviction

Evidence of Marsh's robbery conviction was introduced both to impeach his general credibility as a witness, and his character for peacefulness. The conviction was presented in an effort to convince the jurors that they should disbelieve Marsh's testimony and accept contrary inferences from circumstantial evidence of guilt introduced by the People. To counter this effect, Marsh attempted to introduce evidence he was given probation for this offense he committed at age 20, and that he had not been arrested in the 9 years following. This, coupled with the evidence of his many witnesses, was offered to show the robbery offense was of a nature that he was deemed worthy of probation, that he successfully completed it and his character for nonviolence and for credibility, at the time of this offense and trial, was substantially unlike that which the prosecution was asking the jurors to infer from the mere fact of his earlier conviction. The evidence was refused as not relevant. The People did not base an objection on Evidence Code section 352, nor did the trial court purport to rule on that basis.

The People rely on *People* v. *Malloy* (1974) 41 Cal.App.3d 944, 951-952 [116 Cal.Rptr. 592], in claiming such evidence is not permitted. This case is inapposite. In *Malloy,* the prosecutor was erroneously allowed to introduce the underlying circumstances of a prior narcotics conviction to show Malloy knew the narcotic nature of the substance with which he was actually charged with selling. The underlying circumstances of the prior were found to be probative of the issue, but erroneously admitted over Malloy's Evidence Code section 352 objection. Here, Marsh did not attempt to introduce the *circumstances* of the crime,[2] but instead, offered evidence that the sentencing court felt him deserving of probation, he had proven worthy of that trust and had rehabilitated himself consistent with the testimony of his character witnesses. Certainly, if a jury is exhorted by the prosecutor to disregard Marsh's version of the facts because of his unrelated prior conviction, his successful completion on probation and lengthy period of noninvolvement in further known criminal activities can be considered as evidence suggesting rehabilitation. It is, after all, Marsh's *present* character as to credibility that is directly relevant.[3] Further if, as Marsh suggests, his prior conviction was later expunged pursuant to Penal Code section 1203.4, that

---

[2] Had he done so, the trial court's determination of admissibility should be determined by the factors stated in Evidence Code section 352.

[3] The only other case cited by the People for this proposition, *People* v. *Wynn* (1941) 44 Cal.App.2d 723, 731-732 [114 P.2d 979]), cited the prosecutor's misconduct in introducing facts of a prior conviction. *Wynn* has no factual or legal relevance to our issue.

fact also would have been relevant, admissible evidence. (See *People* v. *Hardwick* (1928) 204 Cal. 582, 590-594 [269 P. 427, 59 A.L.R. 1480].)

■ The trial court's failure to allow Marsh to introduce this directly relevant evidence is an error of constitutional magnitude because this right has been incorporated into the California Constitution by passage of Proposition 8. Thus, article I, section 28, subdivision (d) states in part: "relevant evidence shall not be excluded in any criminal proceeding . . . ." This section retains the trial court discretion pursuant to Evidence Code section 352 but that discretion was not exercised here.

Here, again, the error is one for which we cannot say there is a reasonable possibility it contributed to the verdict. The uncontradicted evidence of persons most closely associated with Marsh during the years after the robbery conviction and present offense described his conduct and demeanor in glowing terms, as an employee, husband, father, custodian of the victim and his sibling, neighbor and community member. However, the evidence unerringly points to child homicide by a battering adult. Accidental death is ruled out beyond a reasonable doubt. Marsh is the only possible assailant.[4] The error does not require reversal.

## THE ADMISSION OF GRUESOME AUTOPSY PHOTOGRAPHS WAS ERROR

Over Marsh's objection, seven autopsy photographs in vivid color were blown up and projected onto a screen for the jurors' viewing. The least gruesome shows an interior section of the victim's skull with the residue of heavy blood clots. (Exhibit 22.) Another shows an almost full view of the victim's nude body the closeup portion of which is the exterior surface of the exposed brain below which dangles part of the bloody scalp and in the background of which is the child's blood-splattered torso "field dressed" with the ribcages rolled back to expose the bowels. Another pictures the victim's neck and head with half of the scalp drawn down over his face and the other half pealed rearward exposing the right hemisphere of the brain. Another exhibits the left brain hemisphere with massive blood clotting and a portion of the severed skull plate lying immediately behind the head.

---

[4]We reach our conclusion although we recognize the error potentially diminishes the ameliorative effect of CALJIC No. 2.40, which advises the jurors that proof of good character for the traits involved may be sufficient, by itself, to raise a reasonable doubt.

Another shows the top of the victim's head with the scalp removed and dangling but with the skull plate still intact, depicting extensive hemorrhaging in several areas. Another is of the right side of the head with the scalp pulled forward and backwards to expose the undersurfaces, showing extensive hemorrhaging. Yet another shows the left side of the head with similar hemorrhaging.

The trial court described the photographs as "certainly shocking." The prosecutor candidly admitted the photos were "terribly gruesome and terribly upsetting," but advocated they be admitted to demonstrate the injury sites and the amount of force inflicted. The prosecutor stressed he would be presenting expert witnesses who would be relying on the injuries they observed in testifying where the various injury sites were and the amount of force necessary to have created the type of injury shown. As the prosecutor stated: "there are sometimes impact sites observed . . . from an examination of the scalp or a bruise . . . on the outside and the question is is there a corresponding blood clot or some type of observed trauma on the brain inside." After brief consideration, the trial court expanded its characterization of the photographs to "terrible" and "gruesome," but found them admissible after considering Evidence Code section 352. The trial court's description of these photos, especially those glossy views of the shimmering red and black gelatinous mass of blood and clotting covering the victim's head and face with the scalp peeled and dangling, is substantially understated.[5]

In arguing against admissibility, Marsh contends there is no issue as to the cause of death. However, the cause of death is precisely the issue. Marsh claims the lacerations and multiple trauma sites must have been accidental. The prosecution alleges the massive internal cranial injuries could only have been inflicted by force of a magnitude far in excess of any accident which could have occurred while only the two very young children were in the room. However, relevance is only one criterion necessary for admissibility in face of Marsh's section 352 objection. The trial court must balance the strength of the probative value against the degree of prejudice inherent in allowing jurors to view the evidence.

Unnecessary admission of gruesome photographs can deprive a defendant of a fair trial and require reversal of a judgment. (See *People* v. *Cavanaugh* (1955) 44 Cal.2d 252, 268-269 [282 P.2d 53].) Autopsy photographs have been described as "particularly horrible," and where their viewing is of no particular value to the jury, it can be determined the only purpose of exhib-

---

[5]In this case, the visceral impact of the photographs could have been reduced substantially by covering portions unnecessary to observing the trauma sites referred to by the autopsy surgeon. This would not have diminished their evidentiary value.

iting them is to inflame the jury's emotions against the defendant. (See *People* v. *Burns* (1952) 109 Cal.App.2d 524, 541 [241 P.2d 308].)

■ Gruesome or not, admission of relevant autopsy photographs is in the sound discretion of the trial court, even where they are only cumulatively used to graphically portray injuries already detailed in the testimony of a doctor witness. (*People* v. *Burns, supra,* 109 Cal.App.2d 524, 542.) Where the prejudicial value of the photographs, due to their inflamatory nature, does not substantially outweigh their probative value, the trial court's exercise of discretion will be upheld.

Here, the jury was not enlightened one additional whit by viewing these seven gory autopsy photographs. The oral testimony of the autopsy surgeon describing his findings comprehensively advised the jury of his observations and why he concluded there were multiple fatal impact sites which could not have been caused by a fall from the sofa to the hearth. The primary cause of death, i.e., intercranial brain swelling, was never disputed. There was no expert medical testimony contradicting the autopsy surgeon's conclusions and various other medical witnesses testified to the cause of death without referring to the autopsy photographs.

Nor is this a case where it is necessary to show the autopsy photographs to prove malice (see *People* v. *Milan* (1973) 9 Cal.3d 185, 194 [107 Cal.Rptr. 68, 507 P.2d 956]) or to justify aggravation of the crime and penalty (see *People* v. *Murphy* (1972) 8 Cal.3d 349, 365 [105 Cal.Rptr. 138, 503 P.2d 594].) Here, where the uncontradicted medical testimony identified the precise location and nature of the injuries the autopsy photographs have little, if any, additional probative value. As in *People* v. *Smith* (1973) 33 Cal.App.3d 51, 69 [108 Cal.Rptr. 698], disapproved on other grounds in *People* v. *Wetmore* (1978) 22 Cal.3d 318, 324, fn. 5 [149 Cal.Rptr. 265, 583 P.2d 1308], "[t]hey supplied no more than a blatant appeal to the jury's emotions. Their prejudice-arousing effect heavily outweighed their probative value." (See also *People* v. *Gibson* (1976) 56 Cal.App.3d 119, 135 [128 Cal.Rptr. 302].) They exemplify prosecutorial overkill in a case where the other evidence of guilt is overwhelming.

However, the erroneous admission of the photographs, even projected many times life-size, did not cause a miscarriage of justice in face of the overwhelming nature of the evidence of guilt. The nonaccidental cause of death which can only have been inflicted by Marsh was unequivocally established by the uncontradicted testimony of every medical witness. The photographic showing was brief and was accompanied by only a cursory clinical description. The projector was turned off during the rest of the autopsy surgeon's testimony. Most importantly, the photographs were shown in sequence with numerous other photographs of the child before removing the life supports and, after they were removed, while lying on the

autopsy table. The inflammatory nature of these other photographs, the admission of which is not an issue on appeal, diminishes the prejudicial impact of the other seven.

The People's expressed position on appeal seems to be that no matter how minimally relevant nor how nauseating photographs are, their admission can never be other than harmless error. Because of this perception, we are constrained to comment further.

The insistence of the prosecutor to admit these additional autopsy photographs led the trial court into error which, in a closer case, would have caused a reversal and necessitated a costly retrial. We expect such acts of prosecutorial brinkmanship in the face of clear case law establishing the error of such admissions are nurtured by the near decisional unanimity that the errors did not require reversal on the facts of those cases. Colorful language in *People* v. *Polley* (1983) 147 Cal.App.3d 1088, 1092 [195 Cal.Rptr. 496], (cited by the People) chiding defendants who have the temerity to challenge admissibility of gory photographs undoubtedly contributes to the apparent lack of concern over creating this error. However sound such criticism may be where the photographs merely depict the wounds of the victims, it is misplaced here. These photographs are gruesome solely because of the autopsy surgeon's handiwork; removing the skull, opening the body cavity, covering the child's face with the exposed underside of the bloody scalp, etc. In other words, their inflammatory nature has been greatly enhanced by the manner in which the surgeon chose to "pose" the body portions.

*People* v. *Palmer* (1984) 154 Cal.App.3d 79 [203 Cal.Rptr. 474], addressed a similar problem, describing a history of disregard for decisions requiring specific instructions when requested in cases where identification is in issue. The repetitive disregard for the existing case law was apparently fostered by a perception that the error would be deemed harmless regardless of how much unentitled advantage the prosecution gained by it.

In *Palmer,* the doctrine of harmless error did not prevent a reversal. The nonadmissibility of inflammatory photographs has been long established and remains the law. Its breach can cause a miscarriage of justice requiring reversal. Only the lack of any viable defense prevented a reversal here.

Judgment affirmed.

Wiener, Acting P. J., concurred.

**KINTNER, J.,**\* Concurring—In this case, the court denied defense counsel's request to ask defendant only two questions as to rehabilitation: (1)

---

\*Assigned by the Chairperson of the Judicial Council.

was Marsh placed on probation (for the prior robbery); and (2) was Marsh arrested for anything since then? These questions were meant to show (1) the felony conviction was not as serious as it sounded, and (2) Marsh violated no laws during that time. If this were misleading (e.g., probation was agreed upon before a plea because of witness problems or the facts of the offense really were aggravated or Marsh violated the law but he was not arrested), the prosecution would have to be allowed to introduce further evidence including facts of the crime when necessary to portray an accurate description. Faced with that, the court could properly exercise its discretion to exclude the defendant's rehabilitation evidence and the prosecutor's evidence explaining it under Evidence Code section 352. However, where, as here, the defendant's proffered evidence was not alleged to be misleading, these two questions would not have been unduly time-consuming and therefore were proper under California Constitution, article I, section 28, subdivision (d).

I agree this was harmless error, and should not be cause for reversal.

Regarding the gory autopsy photographs of the internal injuries, I too agree the court erred in admitting them. I must agree the rest of the child's body could have been masked or partially covered, thus removing the shocking, prejudicial impact. It is clear, as the majority say, that they were relevant, because of the issue as to whether the death was accidental or not. Photographs are often helpful to a trier of fact, especially when one side's theory of the case is inconsistent with the photographs, as the defendant's theory was here. A trier of fact may be more persuaded by photographs, because they are hard evidence, whereas witnesses are often seen as biased or imprecise and thus discounted, even when there are no opposing expert witnesses. The old adage, a picture is worth a thousand words, is no less true in the courtroom, where it can save much time and confusion. The photographs here, showing the amount of force and number of impact sites, are clearly probative and thus enlightening. Again, I agree with my learned colleagues that the error is harmless in view of the overwhelming evidence of guilt.

A petition for a rehearing was denied January 7, 1986, and the opinion was modified to read as printed above.