[No. F006931. Fifth Dist. Sept. 15, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
ERIC MARK WATKINS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II through IV.

**COUNSEL**

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, James T. McNally and Thomas Y. Shigemoto, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

MARTIN, J.—Appellant, Eric Mark Watkins, was charged by information with count I, murder, violation of Penal Code section 187,[1] count II, robbery in violation of section 211, and, count III, attempted murder, in violation of sections 664 and 187. It was further alleged that in the commission of counts I and II appellant personally used a deadly and dangerous weap-

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

on, within the meaning of section 12022, subdivision (b), and in the commission of count III, appellant inflicted great bodily injury within the meaning of section 12022.7. As to count I, a special circumstance, section 190.2, subdivision (a)(17)(i) was alleged, that the murder was committed while appellant was engaged in the commission, or attempted commission, of a robbery.

The district attorney did not seek the death penalty.

Before trial, the prosecution filed a motion *in limine* asking the court to order that the prior testimony of an unavailable witness, Samuel Jones, as contained in the preliminary hearing transcript be read into the record and considered as evidence in the trial of appellant. The court granted the motion finding that the prosecution had shown due diligence in attempting to locate Mr. Jones.

In the midst of voir dire, defense counsel moved for a mistrial based on the fact that out of 60 prospective jurors only 1 member was Black. The court took evidence on the matter, heard argument, and denied the motion.

After trial, the jury returned a verdict of guilty on all counts and found the special allegations to be true.

Appellant was sentenced as follows: count I, life without possibility of parole; count II, the mitigated term of two years, term stayed until the completion of the term imposed on count I; count III, the mitigated term of five years plus a three-year enhancement pursuant to section 12022.7, the sentence to run concurrent to the sentence imposed on count I.

Appellant filed a timely notice of appeal.

### FACTS

On December 14, 1984, Glen Gervais was residing in room 41 at the Topper Motel on Union Avenue in Bakersfield, California. After picking up some paychecks from his employer and claiming money sent to him via Western Union from his mother, Gervais had in his possession on that date $300 in traveler's checks and approximately $1,000 in cash.

Sometime after Gervais returned to the motel after collecting his cash and traveler's checks, Evell Etchison, a fellow tenant of the Topper Motel, observed Gervais in his room talking to Johnny "Rob" Robinson. Etchison believed the two men were engaged in a drug transaction. Etchison de-

scribed Robinson as a Black male, approximately 5 feet 10 inches tall and weighing approximately 180 pounds; he wore an Afro haircut and his skin color was "[a] little darker" than appellant's skin color.

Later, at approximately 4 or 5 p.m. that evening, at Gervais's request, Etchison accompanied Gervais to Hunt's pool hall which was located approximately 100 yards from the Topper Motel; Gervais told Etchison that he wanted to buy some marijuana. Prior to going into the pool hall, Gervais told appellant that he had $1,000 in cash on him because he was going to Canada to visit his mother.

After arriving at the pool hall, Gervais went to the back of the establishment. When he returned he told Etchison that there "was nothing." Etchison and Gervais returned to Etchison's room at the motel. There, the two engaged in conversation until Gervais jumped up suddenly and ran out of the room. It was just getting dark at the time.

At approximately 5:30 to 6 p.m. John Glasser, another resident of the Topper Motel, observed Gervais getting some ice from the ice machine. Gervais returned to his room and then closed the door. Glasser did not see anyone in Gervais's room.

Samuel Jones was the manager of the Topper Motel.[2] Jones stated that he had seen appellant around the motel on two prior occasions, including the morning of December 14, 1984, when he saw appellant knock on Gervais's door.

A few minutes before 6 o'clock, Jones was returning to the motel office after showing a room to a potential tenant. It was dusk at the time and the motel lights had not yet been turned on. Upon Jones's return to the office his wife informed him of a report of a disturbance in room 41. Jones proceeded to room 41 to check out the problem. He knocked on the door three times. When no one answered he opened the door with his pass key. Inside he saw Gervais laying on the floor, fully clothed with blood all over his chest and appellant standing over him. Appellant jumped up and down and started screaming. He then came after Jones with a knife raised over his head and stabbed Jones in the chest. Jones fell and appellant attempted to stab him again; Jones kicked appellant and he fell down. Appellant fled after some tenants came out of their rooms.

After appellant fled, Jones got up and staggered toward the office, approximately 40 feet away from room 41. Jones later described appellant as

---

[2] Samuel Jones did not testify at trial in person. His testimony was read from the preliminary transcript after the trial court deemed him an unavailable witness.

approximately five feet nine inches tall, medium build, wearing a cream-colored jacket, jeans and a knit cap.

Glasser was returning from the ice machine when he observed Jones stumbling back toward the motel office. He then observed a Black man run toward the motel entrance. Glasser described the man as approximately five feet eight to five feet nine inches tall, weighing one hundred and forty to one hundred and sixty pounds. He was wearing sneakers, Levi pants and a dark plaid shirt. The man crossed Union Avenue and ran until he was out of Glasser's sight. Glasser did not see a weapon. Glasser initially observed the man from about 15 to 20 feet. His view was aided by room light coming out of Gervais's room.

On the same date, sometime around 6 p.m., Kathy Lewis was considering renting a room at the Topper Motel. As she was returning to the manager's office after looking at one of the rooms, she saw a Black man, not appellant, emerging from the shrubs in the area of rooms 38 and 39. Some minutes later, upon her return from viewing a second room, Lewis encountered Jones pounding on the motel office door stating that he had been stabbed. Lewis did not observe anyone fleeing the scene.

Becky Erehart, an ex-police officer, was on her way out to dinner at a restaurant located on Union Avenue and Fourth Street on December 14, 1984, when she was passed by two police cars and saw several emergency vehicles parked at the Topper Motel. After dining, while she was driving down the alley behind the restaurant, she observed a man wearing a khaki work uniform and a tan windbreaker coming down the alley. The man was approximately five feet eight to six feet two inches tall and had glazed eyes and a twisted face as if he was under the influence of drugs such as PCP. His clothes were stained with something she could not identify.

Gervais had been stabbed 32 times. A search of his room uncovered no useful prints and a large sum of money believed to have been on the victim's person was not found. Jones was treated for a stab wound to the right side of his chest and a cut on his left ring finger.

On December 18, 1984, Detective Leslie Vincent of the Bakersfield Police Department received an anonymous tip from a male[3] regarding the murder of Gervais. The man stated that the perpetrator was a young Black male, 20 to 21 years of age, 5 feet 9 inches to 5 feet 10 inches in height; he wore his hair in a short "Jeri-curl," had no facial hair and had blood stains on his sleeves and tennis shoes. On December 19, 1984, Vincent received a second

---

[3] Detective Vincent characterized the voice on the phone as that of a Black male.

call from apparently the same person stating appellant, Eric Watkins, was responsible for the murder.

Thereafter, Vincent prepared a photographic lineup containing appellant's photograph and showed it to Jones and to Glasser. Each independently selected appellant's photograph after being told a picture of the suspect may or may not be included in the lineup.

Appellant was arrested. After being advised of his *Miranda*[4] rights and waiving the same, appellant stated that on December 14, 1984, he had been at the Sixth Street park all day. He stated that he had never been to the Topper Motel and he did not go to Hunt's pool hall that evening though he did go to Jwynet's liquor store next to the pool hall at approximately 7:30 p.m. Appellant stated that he learned about the stabbing from his mother. Appellant consented to the search of his home.

At trial, appellant testified that he had been at the Sixth Street park between 11 a.m. and 7:30 p.m. At 7:30 p.m. he went home and at approximately 8 p.m. his mother sent him Jwynet's liquor store for some milk. He stopped by Hunt's pool hall for about 15 minutes and got back home at approximately 8:30 p.m. Before he left to go to Jwynet's his mother told him that a neighbor had said someone had gotten stabbed at the Topper Motel. The only time appellant had been at the Topper Motel was when he was seeking temporary work. Appellant stated that on the particular evening in question he was wearing brown pants, a leather jacket and a white and blue polyester jacket over the leather jacket.

Vincent contacted appellant's mother the date of the arrest. She stated that appellant had left just before dark to get some milk for her and that he had returned home at approximately 10 p.m. without any purchases. At trial, appellant's mother testified that at approximately 5 to 5:30 p.m. appellant went to the store to get a bottle of "pop" and a carton of milk. He returned home at approximately 7 p.m. She asked about the police cars at the Topper Motel and appellant said "a dude came into the pool hall and said someone got stabbed right there."

Hunt's pool hall manager Dorl Gates recalled Gervais and Etchison shooting pool at approximately 1 p.m. on December 14, 1984. The two left but Gervais without Etchison returned at approximately 4:30 to 5 p.m. Gervais talked to someone and left. Gates testified both appellant and Johnny Robinson had been at the pool hall most of the day.

---

[4] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

Jeffrey Loftus, a professor of psychology, testified for the defense as to the vagaries of eyewitness identification. He testified as to the inaccuracy of memory and that among the factors that render memory inaccurate are environmental circumstances such as length of observation, lighting, presence of a life-threatening object such as a knife, and characteristics of the observer such as fear or stress. Factors that should be taken into consideration include cross-racial identification—i.e., persons are less able to recognize members of races other than their own; unconscious transference—process by which one recognizes someone that they have seen before as a person who participated in a later event; and after acquired information—one can consciously integrate one's recall into present information such as a post-event lineup.

## DISCUSSION

### I

■ Appellant contends his conviction must be reversed because he was charged with murder with malice aforethought, a violation of section 187, but he was convicted of felony murder, a violation of section 189. ■ Appellant's position is based on the rule of law that "[w]hen a defendant pleads not guilty, the court lacks jurisdiction to convict him of an offense that is neither charged nor necessarily included in the alleged crime." (*People* v. *West* (1970) 3 Cal.3d 595, 612 [91 Cal.Rptr. 385, 477 P.2d 409].)

The information, in part, charges appellant "did willfully, unlawfully and with malice aforethought murder GLEN DALE GERVAIS, a human being, in violation of Section 187 of the Penal Code." It was further alleged that in the commission of the murder, appellant personally used a deadly and dangerous weapon and that at the time the murder was committed, appellant was engaged in the commission of a robbery.

The case was tried on the theory of felony murder and the jury was instructed in pertinent part as follows: "The defendant is charged in Count 1 of the information with the commission of the crime of murder, a violation of Section 187 of the Penal Code. Crime of murder is the unlawful killing of a human being with malice aforethought or the unlawful killing of a human being which occurs during the commission of or attempt to commit a felony inherently dangerous to human life.

"In order to prove the commission of the crime of murder each of the following elements must be proven:

"One, the human being was killed,

"Two, that the killing was unlawful, and

"Three, that the killing occurred during the commission or attempt to commit a felony inherently dangerous to human life.

"$\ \cdot\ \ \cdot\ \ \cdot\ \ \cdot\ \ \cdot\ \ \cdot\ \ \cdot\ \ \cdot\ \ \cdot\ \ \cdot\ \ \cdot\ \ \cdot\ \ \cdot\ \ \cdot\ \ \cdot\ \ \cdot\ \ \cdot\ \ \cdot$

". . . If you find the defendant in this case is guilty of murder of the first degree, as charged in count 1 of the information you must then determine if murder was committed under the following special circumstances: That is during the commission of or attempted commission of the felony crime of robbery. A special circumstance must be proved beyond a reasonable doubt.

"If you have a reasonable doubt as to whether a special circumstance is true, it is your duty to find that it is not true."

The verdict form, signed by the foreman, read:

### "FIRST COUNT

"We, the Jury, empaneled to try the above entitled cause, find the defendant, ERIC MARK WATKINS, guilty of Felony, to wit: Murder of Glen Dale Gervais, in violation of Section 187 of the Penal Code, as charged in the first count of the information, and do hereby fix the degree as Murder in the first degree."

Appellant was convicted of first degree murder. The jury also found appellant personally used a deadly and dangerous weapon and that appellant was engaged in the commission of a robbery at the time of the murder.

In *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], in the context of a direct attack on the constitutionality of the felony-murder rule, the California Supreme Court held that section 189, not section 187, codified felony murder. (*Id.* at pp. 465, 472.) Appellant contends that since the case of *People* v. *Dillon, supra,* a defendant may no longer be convicted of felony murder, a violation of section 189, when the information charges only murder with malice, a violation of section 187.

The proposition that a defendant may be convicted of felony murder even though the information charges murder with malice can be traced back to *People* v. *Witt* (1915) 170 Cal. 104 [148 P. 928].

In *People* v. *Witt, supra,* the information charged the defendant as follows: " 'That the said [defendants] . . . did willfully, unlawfully, feloniously and with malice aforethought, kill, murder . . . a human being.' " (*Id.* at p. 107.) Defendant was convicted of felony murder. On appeal, defendant claimed that the quoted language did "not sufficiently allege the kind of murder proved in this case, viz: one committed in the perpetration or attempt to perpetrate one of the felonies specified in section 189 of the Penal Code." (*Ibid.*) The California Supreme Court affirmed the conviction reasoning: "Whatever may be the rule declared by some cases from other jurisdictions, it must be accepted as settled law of this state that it is sufficient to charge the offense of murder in the language of the statute defining it, whatever the circumstances of the particular case. As said in *People* v. *Soto,* 63 Cal. 165 'The information is in the language of the statute defining murder, which is: "Murder is the unlawful killing of a human being with malice aforethought" (Pen. Code, sec. 187). Murder, thus defined, includes murder in the first degree and murder in the second degree. It has many times been decided by this court that it is sufficient to charge the offense committed in the language of the statute defining it. As the offense charged in this case includes both degrees of murder, the defendant could be legally convicted of either degree warranted by the evidence.' Under our decisions there is no ground for distinction in this regard between the class of murder in the first degree here involved and any other class. *People* v. *Hyndmann,* 99 Cal. 1, . . . does not decide otherwise. Our simplified system of pleading in criminal cases has been in use for many years, and we think it may safely be said that it has not been found that defendants have in fact been without sufficient notice of the nature of the charge against them to enable them to make such defense as they had." (*Id.* at pp. 107-108; in accord, *In re Walker* (1974) 10 Cal.3d 764, 781 [112 Cal.Rptr. 177, 518 P.2d 1129]; *People* v. *Romo* (1975) 47 Cal.App.3d 976, 989 [121 Cal.Rptr. 684]; § 952.)[5]

Thus, *People* v. *Witt, supra,* 170 Cal. 104, and its progeny, expressly stand for the proposition that a jury may be instructed on felony murder where the information charges murder with malice.

In *People* v. *Dillon, supra,* the California Supreme Court stated: "[W]ith respect to any homicide resulting from the commission of or attempt to

---

[5] Section 952 provides in pertinent part: "In charging an offense, each count shall contain, and shall be sufficient if it contains in substance, a statement that the accused has committed some public offense therein specified. Such statement may be made in ordinary and concise language without any technical averments or any allegations of matter not essential to be proved. It may be in the words of the enactment describing the offense or declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is accused."

commit one of the felonies listed in the statute, our decisions generally hold section 189 to be not only a degree-fixing device but also a codification of the felony murder rule: no independent proof of malice is required in such cases, and by operation of the statute the killing is deemed to be first degree murder as a matter of law." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 465.)

In *People* v. *Dillon,* the California Supreme Court merely recognized what it perceived to be the law since the enactment of section 189 in 1872. *Dillon,* which interprets, rather than reinterprets, section 189, should not be read to change the well-accepted rule of pleading set forth in *People* v. *Witt.* ■ Whether murder is committed with malice, or in the context of felony murder, the crime committed is still murder. And while identification of the statute violated is advisable, it is not required. (*People* v. *Schueren* (1973) 10 Cal.3d 553, 558 [111 Cal.Rptr. 129, 516 P.2d 833].) Therefore, an information charging murder is sufficient to charge either a violation of section 187 or section 189.

■ Furthermore, under the facts at bar, appellant was not prejudiced by the prosecution's failure to specifically charge appellant with violation of section 189. The information alleged that the murder was committed in the commission of a robbery as a special allegation. At both the preliminary hearing and trial, the only theory advanced by the prosecution was felony murder, and the defense was not misled or deceived by the charging allegation.

Finally, as alluded to by respondent, the problem herein could be characterized as a variance between pleading and proof.

Section 960 provides: "No accusatory pleading is insufficient, nor can the trial, judgment, or other proceedings thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits."

The variance involved a distinction between felony murder and all other forms of murder, the former being a violation of section 189, and the latter, violations of section 187. Appellant nevertheless knew at all times that he was defending a murder which occurred in perpetration of a robbery; he never objected to the theory pursued by the prosecution at trial—felony murder—and is apparently unable even now to express how he was misled by the variance.

In view of the liberalized rules of pleading in California, this nonprejudicial variance, if it be such, may not be permitted to defeat the conviction.

Respondent argues that the failure to charge appellant with violation of section 189 is immaterial since in the prosecution for first degree murder it was unnecessary to state the method or degree of murder. Respondent states, quoting from *People* v. *Milan* (1973) 9 Cal.3d 185, 195 [107 Cal.Rptr. 68, 507 P.2d 956]: "[I]n a prosecution for first degree murder it is not necessary that all jurors agree on one or more of several theories posed by the prosecution; it is sufficient that each juror is convinced beyond a reasonable doubt that the defendant is guilty of first degree murder as that offense is defined by statute."

Appellant responds that this rule of law does not survive *People* v. *Dillon, supra,* 34 Cal.3d 441, since the rule relies upon the premise that all first degree murders are defined by section 187; this is no longer the case.

*Dillon* is an unusual, unique case and should not be applied overbroadly. There, it would appear, the court sought and achieved a particular result, the reduction of Mr. Dillon's first degree murder conviction to second degree murder. In doing so, it analyzed section 189 and the felony-murder doctrine in California in great detail and ultimately rejected defendant's contentions that the first degree felony-murder rule in this state is an uncodified common law rule that should be abolished and, if on the contrary it is embodied in a statute, the statute is unconstitutional. While *Dillon* rejected these arguments, it reached the above stated result on an entirely different basis, that on a proportionality analysis, the sentence there imposed constituted cruel and unusual punishment. Thus, we conclude, *Dillon* does not stand for the proposition advanced by appellant.

## II-IV*

. . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Franson, Acting P. J., and Hamlin, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 23, 1987. Mosk, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante,* page 258.