Filed 9/30/16  P. v. Webb CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JASON LEE WEBB,<br><br>        Defendant and Appellant. | A141992, A142769<br><br>(Contra Costa County<br>Super. Ct. No. 51206911) |

Jason Lee Webb was convicted of possessing child pornography and committing multiple sex crimes upon a child.  In this appeal, he contends (1) the court erred in admitting photographs found on his computer and cell phone, which depicted young females in diapers, children being spanked, and Webb himself wearing diapers; and (2) a victim restitution award for noneconomic losses should be reversed because the court rather than a jury made required findings of fact, and the findings were not supported by sufficient evidence.  We will affirm the judgment.

## I.  FACTS AND PROCEDURAL HISTORY

An amended information filed in May 2012 charged Webb with two counts of sexual penetration of Jane Doe, a child 10 years old or younger (Pen. Code, § 288.7, subd. (b)); one count of committing a lewd act upon Jane Doe, a child less than 14 years old (§ 288, subd. (a)); one count of possession of child pornography (§ 311.11, subd. (a));

and one misdemeanor count of exploitation of a child (§ 311.3, subd. (a)).[1]  The matter proceeded to a trial by jury.

A.  Prosecution Case

1.  Webb, Tara, and Three-Year-Old Jane

Tara E. testified that, while living in Kentucky with her three-year old daughter, Jane Doe, she met Webb in an online chat room.  Tara and Webb talked online for at least a year and eventually spoke by telephone.  Tara told Webb that she had a young daughter and was having problems with her family.

In May 2011, Webb invited Tara to stay at his home in Rodeo, which he shared with his father, two brothers, and a roommate.  In late May, Tara left Jane in her mother's care and drove to California.  In early June, Tara and Webb got married.  Tara and Webb then drove to Kentucky and returned with Jane to Rodeo.

Tara and Jane soon became unhappy in California.  Tara was not "doing anything" and she never had sex with Webb.  Jane wanted to return to Kentucky, and she would wake up at night, cry a lot, and occasionally wet herself even though she had been potty-trained at the age of one.  Webb and Jane seemed to get along, but Tara's "motherly instinct" did not want Jane to be alone with him.

For the Fourth of July holiday in 2011, Webb, Tara, Jane, and others went on a camping trip with members of their church.  Webb, responsible for taking pictures during the trip, took 150–200 pictures with his cell phone.  The evidence is disputed as to whether they returned on July 4 or July 5—the significance of which will become apparent *post*.

On July 7, 2011, Children and Family Services (CFS) made an unannounced visit to Webb's home and inquired into Jane's welfare.  A CFS agent complained that the house was dirty, instructed Webb to clean it, and said CFS would return for an inspection in a few weeks.

---

[1]  All statutory references are to the Penal Code.

2. Webb's Arrest

On August 8, 2011, Contra Costa County sheriff deputies Dustin Gregory and Eric Perla went to Webb's home in response to a CFS report that Webb possessed child pornography.

Deputy Gregory asked Webb if he could look at Webb's electronic devices. Webb claimed that his cell phone was in his father's work truck and unavailable, and it was only a basic model without a camera; he claimed that his computer had a virus or "worm" and was not working correctly. Eventually, however, Webb unlocked his computer and allowed Gregory to look at it.

While Deputy Gregory examined Webb's computer inside the house, Deputy Perla spoke with Webb on the front porch. Webb volunteered to Perla that he had a fetish for diapers and spankings, and his computer contained non-pornographic photographs of girls between the ages of 3 and 15 years old in diapers, some of which showed spanking.

Deputy Gregory found that, indeed, Webb's computer contained numerous pictures that constituted child pornography, including photos of children wearing diapers. Some of the children were in provocative poses, and others appeared too old to be wearing them. Gregory noticed that one of the photographs depicted a child with red marks on her buttocks as if she had just been spanked.

Deputy Gregory arrested Webb and placed him in the rear seat of his police car. There, after receiving warnings under *Miranda v. Arizona* (1966) 384 U.S. 436, Webb again told Deputy Perla that his computer contained pictures of girls between the ages of 3 and 15 years old in diapers; he also referred to himself as a pedophile numerous times. Webb explained that he downloaded the pictures onto his computer from a website. And he later claimed that Tara was aware of his fetishes with diapers and spanking.

Tara became upset when Webb was arrested and even more upset when Deputy Gregory explained the reason for the arrest and what he found on Webb's computer. Tara told Gregory that she had been using Webb's cell phone because her phone had been disconnected; she gave Gregory the phone. Gregory noted that Webb's phone had a camera lens after all.

### 3. Photographs on Webb's Computer and Cell Phone

Detective Bryan Michaud, an expert in computer and cell-phone analysis, testified that he went to Webb's residence and examined four or five computers. One of the computers, which had the user name of "Jason," contained 253 child-pornography images in a folder labeled "Jason Pictures." The children appeared to be aged from "zero" to 16 years old. There were photographs of children who were unclothed, in diapers, or being spanked. There were videos of juveniles in sexually explicit positions, and juveniles placed in various positions to focus on their genitalia, pubic regions, and breasts. The computer contained links to websites depicting juveniles in diapers, search history terms for diapers and punishment, references to baby talk and "adult baby diaper lover," and videos involving diapers and spanking. Some of the photographs showed children who had been bound, and the subjects of other photographs had urinated or defecated on themselves.

Detective Michaud also examined a cell phone he received from Detective Gregory, using Cellebrite software to download the contents of the phone and create a report. The phone contained 356 images. A series of 11 photographs, taken on July 4, 2011, showed Jane in underwear, then in a diaper, then with the diaper removed, and finally with her vagina spread open and a male hand inserted inside. In some of these photographs, Jane had red buttocks, consistent with being spanked. The time stamps on the pictures showed that they were taken in chronological sequence, between 6:25 p.m. and 6:29 p.m. Additional images showed other female juveniles with and without diapers, as well as images depicting Webb taking pictures of himself in a diaper.

In addition to Detective Michaud's testimony, the prosecutor introduced into evidence dozens of the photographs found on Webb's computer and cell phone, as well as forensic reports of the computer and cell phone images, discussed *post*.

### 4. Webb's Interview With Police

Detective Xavier Shabazz testified that he interviewed Webb on August 8, 2011. The interview was recorded, and a redacted version of the recording was played for the jury.

During the interview, Webb told Detective Shabazz that Tara was aware of his "feelings for children" but there was "no way in hell [he] could ever touch a little—a child right there." He explained that he had been raped multiple times as a child and he would not want anyone else to endure a similar experience.

Webb admitted that he had pictures on his computer of children aged 3 to 15, and that he had masturbated to some of those pictures. He added that he also had pictures on his phone, but he did not masturbate to them.

Webb initially denied touching Jane. But when Detective Shabazz said there were pictures of Webb touching Jane's "vaginal area," Webb replied that "it probably happened the night I got drunk." He explained that he had gone out and gotten drunk after fighting with Tara. When he returned home, Tara was asleep. He began taking pictures of Jane in various poses until he eventually "had her damn near naked." In one of the pictures, Webb had just given Jane a spanking. He acknowledged placing his fingers over the outside of Jane's vaginal lips. He "tried" to insert his fingers inside, but thought about what had happened to him and "mentally couldn't do it." After the photograph session, Webb removed Jane from the room and masturbated until he ejaculated into a towel.

### 5. Tara's Interview With Police

On August 10, 2011, Detective Shabazz interviewed Tara. This interview was recorded, and the recording was played for the jury.

Tara's interview is not in the appellate record. According to Webb's opening brief, Tara said in the interview that, near the end of June 2011, Webb admitted to her that he used to have a sexual attraction toward children, and Tara said she would feel more comfortable if she were present whenever he was around Jane. Tara also told Detective Shabazz that Webb once asked her to put on a diaper so he could spank her, and she thought it was weird and was angry with him afterwards. At trial, Tara could not recall this incident. Because neither the recording of the interview nor a transcript is in the record, we do not rely on this material.

6.  Dr. Abraham Rice's Testimony

Pediatrician Abraham Rice testified as an expert in medical findings and sexual assault, as well as memory development in young children.

Dr. Rice examined Jane, with Tara present, on August 15, 2011.  Tara said Jane's behavior had changed since they came to California:  Jane had trouble sleeping through the night, which had not previously been a problem; she did not want to go to the bathroom alone, which was unusual; and day and night she was wetting herself with urine and soiling her pants with stool, which were new behaviors.  During the week since August 8 (the day of Webb's arrest), however, Jane had been sleeping better.  Dr. Rice opined that children who have been traumatized often have disruptions in normal habits like sleeping and toileting, but would probably not remember the specifics of what happened at age three.

Dr. Rice examined photos of Jane showing redness around her anus, which was consistent with sexual abuse, and redness on her buttocks, which was consistent with spanking.  In some of the photos, Jane was posing in provocative positions that did not seem normal for a three-year-old child.

Dr. Rice also examined two photos (Exhibits 18 and 20) showing Jane with an adult hand (finger) inserted about two inches (to about the second knuckle) into her vaginal opening.  Dr. Rice opined that this would typically cause "quite a bit" of pain to a child of Jane's age.

Based on his examination of Jane and the photographs, Dr. Rice concluded that Jane was a victim of sexual abuse.

7.  Jane's Testimony

Jane testified that she did not recognize Webb.  She remembered that she did not like living in California, but when asked if anything happened there that she did not like, she replied, "I don't remember."

B.  Defense Evidence

Webb testified that he is an "[a]dult baby diaper lover" or "ABDL."  When he was around 11 years old, he discovered his sexual attraction toward girls in diapers.  His

fetish extends to other baby-related themes, including "baby talk," pacifiers, bottles, and depictions of spanking and wetting. When he was 12, he wrote a message on a website page that said, "I am an ABDL. If you do not like it, get the fuck off my page." He was 20 years old at the time of his arrest.

Webb acknowledged that he described himself to Deputy Perla as a pedophile, because that was the diagnosis he received from his therapist. He understood "pedophile" referred to anyone who has fantasies that are "irregular" towards children. He claimed, however, that his attraction was more to the diaper, particularly frontal pictures of diapers or rear pictures of diapers. He added that he is attracted only to patterned diapers, not plain white ones. Webb told Tara, his family, and his pastor about his fetish.

Webb acknowledged that he took photographs of himself wearing a diaper. One of the photographs showed him in a diaper in which he had just defecated. Webb testified that he was exploring his fetishes.

Webb did not think the computer images of children in diapers and being spanked would be a problem, because he did not think they were pornographic. He acknowledged, however, that looking at the photos aroused him.

Webb denied taking the photographs of Jane shown in court, including the ones found on his cell phone. He did not know how her pictures got on his phone, but he thought someone might be trying to frame him.

Webb also denied it was his hand in the photographs that depicted an adult hand inserted into Jane's vagina. He explained that his hand had a different length and, unlike the hand in the pictures, his hand had a discolored area. Besides, he doubted the date and time stamps on the photographs were correct, because the shadows in his room at 6:00 p.m. on July 4 are different from the shadows shown in the photographs, and he could not have photographed Jane at his house on July 4 because he had not yet returned from the camping trip. When Shabazz asked him about photos on his phone, he was confused and thought Shabazz was referring to the pictures from the camping trip rather than photos of

Jane undressed. He was not really listening to what Shabazz was saying, but merely trying to say whatever would bring the interview to an end. And he was nervous, too.

Webb explained that, although he told the deputy that his cell phone did not have a camera, he actually had two cell phones, only one of which had a camera, and he had been referring to the one that had no camera.

Webb denied touching Jane, or any child, inappropriately.

B. Verdict and Sentence

The jury found Webb guilty on all counts.

The court sentenced Webb to a total term of 15 years to life, plus six years, eight months: concurrent 15-year-to-life terms on the two sexual penetration counts; plus a consecutive six year term for lewd act on a child less than 14; plus a consecutive eight month term (one-third the middle term) for child pornography. The court also imposed a one-year jail term on the misdemeanor count for child exploitation, with credit for time served. The court ordered Webb to pay victim restitution and reserved the issue of the amount.

Webb filed a notice of appeal from the judgment on May 28, 2014 (appeal number A141992).

C. Restitution

On August 5, 2014, the prosecutor filed a brief addressing restitution. The prosecutor requested that Webb be ordered to pay $200,000 in noneconomic restitution under section 1202.4, subdivision (f)(3)(F). Over Webb's objection, the court imposed noneconomic restitution in the amount of $50,000 plus $1,167.20 in expenses at a hearing on October 17, 2014, based on evidence discussed *post*.

Webb filed a notice of appeal from the post-judgment restitution order on December 12, 2014 (appeal number A142769).

We consolidated the two appeals.

II.  DISCUSSION

A.  Admission of Photographs Found on Webb's Computer and Cell Phone

The photographs introduced into evidence from Webb's computer and cell phone can be divided into three categories:  (1) photos of Jane in diapers and other states of undress, including two photos depicting an adult finger inserted into her vagina; (2) photos of other female juveniles in diapers or being spanked, including children bound or with indications of urination or defecation, as well as photos of diapers, some of which were soiled; and (3) photos of Webb himself in a diaper.  Webb does not dispute the admissibility of the photographs of Jane, including those that allegedly depicted the charged sexual abuse.  But he does contend the court erred in admitting the other photographs, urging that the court should have excluded them under Evidence Code section 352.

1.  Background

Under Evidence Code section 352, Webb filed motions in limine to exclude any reference to or evidence of "Mr. Webb's fetishes involving diapers or spankings" or "photos of Mr. Webb in diapers."  At the hearing, defense counsel argued that the pictures of diapers and spankings were highly inflammatory and of minimal probative value.  The prosecutor countered that the photos evinced Webb's prurient interest in diapers, which was relevant to show his sexual intent for purposes of the section 288 count and identity—particularly, that Webb was the one who took the entire sequence of photographs on July 4, 2011, including those that were the subject of the section 288.7 counts.

The court, finding that the photographs constituted "direct evidence and circumstantial evidence of the various counts" and were more probative than prejudicial, denied Webb's motions.  Nonetheless, photos that were cumulative or of only marginal relevance were withheld by the prosecutor or ruled inadmissible by the court.  For example, the court allowed introduction of only about one-third of the photographs on Webb's computer.  As to the photos that were allowed, the court gave several explanations, including the following:  some photos Webb took of himself showed his

fingers, and were therefore relevant to his claim that the hands in the photos depicting the digital penetration of Jane were not his; photos of children in pornographic attire and positions were relevant to refute Webb's claim that he did not possess child pornography; a video of adult women in diapers was probative of his lewd intent; and photos Webb took of himself in a diaper were probative because the metadata proved he took the photos of himself and Jane.

At trial, the prosecution introduced 17 pages of photographs found on Webb's computer (Exs. 98-114). Webb represents that each of these 17 pages contained four photographs. In addition, the prosecutor introduced a forensic report of the photographs found on Webb's computer (Ex. 118) and a 146-page Cellebrite software report detailing the contents of Webb's cell phone (Ex. 115). There is general agreement between the parties, and some indication in the record, that the photographs included pictures of diapers, juveniles in diapers, completed spankings or spankings in progress, juveniles in various poses, diapers containing urine or feces, and photos of Webb.[2]

2. Analysis

Evidence Code section 352 reads: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger

---

[2] Webb's opening brief describes the photographs and the reports in greater detail. As to the photographs, Webb represents that some of the girls in the photos were bound or in the process of being whipped or beaten with blunt instruments (Exs. 98-99, 106, 112), some photos showed very young girls wearing diapers and posing erotically or with their legs spread apart (Exs. 100, 105, 108, 114), others showed just a rear or crotch view of a diaper (Exs. 101, 108, 113), and a few showed young boys in diapers (Exs. 107, 114). He represents that the report on the photos from Webb's computer contained more than 50 additional photographs of minors, many of them wearing diapers and some posing provocatively; some of these photos were duplicative of other exhibits. He also represents that the report of the cell phone photos included miniature images from larger diaper photographs found on the phone, along with photos depicting only a diaper, with many of the diapers containing urine or feces (Ex. 115). Because the exhibits are not part of the appellate record, we do not consider Webb's descriptions unless otherwise supported by citations to the record.

of undue prejudice, of confusing the issues, or of misleading the jury."  We review a section 352 ruling for abuse of discretion.  (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

### a.  Probative Value

The challenged photographs had probative value.  First, some of the photos provided direct evidence supporting the charges.  Webb was charged with possession of child pornography (§ 311.11, subd. (a)), which targets the knowing possession of images depicting a person under the age of 18 engaging in or simulating sexual conduct.  He was also charged with exploitation of a child (§ 311.3, subd. (a)), which criminalizes the knowing development, duplication, print, or exchange of an image depicting a person under the age of 18 years engaged in an act of "sexual conduct," including penetration of the vagina and, for the purpose of sexual stimulation of the viewer, sadomasochistic abuse, exhibition of the genitals or the pubic or rectal area of any person, and defecation or urination.  (§ 311.3, subd. (b).)

Second, the photos of diapers, female children in diapers, Webb's hand on a diaper and, to a lesser degree, Webb in diapers, were relevant to show *identity*:  that *he* was interested in diapers, Jane in diapers, and spanking, and—contrary to his testimony at trial—that *he* took the photographs on his cell phone and it was *his* finger that was depicted (in an admissible photograph) inside Jane's vagina.

Third, the diaper and spanking photos were relevant to show Webb's *intent*.  Section 288, subdivision (a) criminalizes lewd or lascivious acts upon the body of a child under the age of 14, with the "intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or child . . . ."  The diaper and spanking photographs tended to show Webb's sexual reason for committing the acts (depicted in other admissible photos) on which the prosecutor based the charge:  changing Jane from underwear to a diaper, touching her leg to set up a "rear-focused . . . diaper shot," and spanking her, as reflected in a photo of her red buttocks.[3]

---

[3]  The photographs may have also been relevant to the two counts under section 288.7, subdivision (b) for "sexual penetration" of a child 10 years old or younger.  Sexual penetration is the act of causing the penetration of the genital or anal opening "for the

Fourth, respondent argues (as did the prosecutor) that the photos of Webb in diapers were relevant to show his sexual attraction to diapers. Webb disagrees, urging that they instead show a psychological condition known as infantilism, "which manifests itself in a desire to wear diapers and regress back into a child who soils himself" (*United States v. Mood* (E.D.Mich. 2010) 741 F.Supp.2d 821, 823), and there was no expert witness testimony tying Webb's infantilism to any sexual interest in diapers or Jane. This argument, although ignored by respondent, is unavailing. Webb has not shown that he advanced the argument in the trial court; at trial, Webb testified that he wore the diaper and soiled himself because he was exploring his fetish for diapers and "testing to see if it excited [him] or not."

At any rate, photos of Webb in diapers were probative in another respect, because the metadata associated with the digital images indicated the photos were taken around 9:00 a.m. on July 5, 2011, apparently in Webb's bathroom, contrary to his testimony that he had not returned from the camping trip by that time. In short, Webb has not established that the photographs he challenges lack probative value.

### b. No Undue Prejudice

Evidence may be inadmissible under Evidence Code section 352 if the probative value is "*substantially* outweighed by the probability that its admission will . . . create *substantial* danger of *undue* prejudice . . . ." (Evid. Code, § 352. Italics added.) Evidence is prejudicial in this context if it "is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction." (*People v. Doolin* (2009) 45 Cal.4th 390, 439.) Webb contends the photographs were unduly prejudicial because they were cumulative and inflammatory.

---

purpose of sexual arousal, gratification, or abuse . . . ." (§ 289, subd. (k)(l).) Webb asserts that Jane was not wearing diapers in the photos that were the basis for these counts (Exs. 18 and 20), so his diaper fetish sheds no light on his intent at the time of the penetration. He overlooks the fact that the diaper and spanking photos of Jane immediately preceded the photo of the penetration of Jane. At any rate, Webb's argument is unavailing because he does not provide the exhibits in the record.

Specifically, Webb argues that the prosecution did not need to introduce dozens of photographs of diapered babies, some of which displayed bondage or bodily functions, since it already had ample evidence to prove his diaper fetish: Webb told Deputy Perla that he had the fetish and that his computer contained pictures showing his interests, and Deputy Gregory and Detective Michaud gave oral testimony about the contents of Webb's computer and cell phone. And even if a few photographs may have been admissible to illustrate Michaud's testimony, Webb argues, there was no need to admit hundreds of them. Webb contends this case is therefore akin to *People v. Marsh* (1985) 175 Cal.App.3d 987 (*Marsh*).

In *Marsh*, the defendant had admitted that he was the only person present who could have inflicted fatal blows to the head of the two-year-old victim, but the cause of death remained at issue. (*Marsh, supra,* 175 Cal.App.3d at p. 992.) On this issue, the trial court admitted seven color autopsy photographs of the two-year-old, which were blown up "many times life-size" and projected onto a screen for the jury. The photos showed the child's naked body, his bloody torso, his ribcage rolled back to expose his bowels, half of his scalp pulled down over his face, blood and clotting covering his face and head, his scalp peeled back and dangling, and his brain exposed. The appellate court found that the photographs did not add to the autopsy doctor's oral testimony, and the inflammatory and cumulative photographs should not have been admitted. (*Id.* at pp. 997–998.)

*Marsh* is obviously distinguishable from the matter at hand. Here, unlike *Marsh*, identity and intent were at issue. Moreover, the photographs in this case were not blown-up *autopsy* photographs of the victim's blood-covered body and exposed brain and bowels. They were photos of diapers, children in diapers, Webb in diapers, and spanking. While the images might have struck the jury as unusual, they are not the type of photograph that would so enrage the jury (or distract the jury) as to eschew its sworn duties as jurors and convict Webb of charges for which the evidence was insufficient.

Webb nonetheless persists that photos depicting a defendant's bizarre sexual fetishes can inflame the jurors' passions and lead them to decide a case based on personal

antipathy toward the accused.  He contends few people would know that a diaper fetish exists (an assumption not in the record), so the photos must have had a "shock value" and subjected him to ridicule as a sexual deviant.  The number of photos suggested a bizarre borderline obsession on an inanimate object (the diaper).  Even more shocking, he claims, were the photographs of Webb in diapers and the images of urination, defecation, and bondage.

We disagree.  Photos of diapers and of children in diapers are not shocking. Photos of urination, defecation, and bondage were direct evidence of the child pornography charge.  While the images were likely unpleasant, there is no indication they were any more inflammatory than Webb's testimony on these subjects and his own proclamation—to the police and to the jury—that he had a fetish for diapers and spanking and wore diapers to explore his diaper fetish.  Indeed, many of the diaper photos were integral to Webb's *defense*, long before the court decided to let them into evidence, since the excuse he repeatedly gave police for having the photos on his computer was that he had a diaper fetish and they were not pornographic.

Another California case on which Webb relies is plainly inapposite as well.  In *People v. Earle* (2009) 172 Cal.App.4th 372, 401 (*Earle*), the question was whether an indecent exposure charge should have been severed from an assault charge.  In concluding that the charge should have been severed, the court stated:  "As a repellent sexual aberration—what is still widely known as a 'perversion'—the indecent exposure would naturally incline the jury to view defendant as a kind of freak, a pariah, a 'pervert.' This would at a minimum reduce the jurors' natural compunction about convicting him of the more serious offense on questionable evidence, as well as impairing their ability to view evidence of that offense objectively."  (*Id.* at p. 401.)

But *Earle* had nothing to do with the admissibility of evidence, let alone whether the prejudicial effect of evidence of indecent exposure or some other "perversion" would substantially outweigh its probative value.  If anything, the court recognized the usually benign nature of such evidence:  "Surely in many contexts an act of indecent exposure would *not* be expected to 'inflame' a jury's sentiments, however obnoxious they might

find it.  Notwithstanding its loathsomeness, it remains a distinctly nonviolent offense."
(*Earle, supra*, 172 Cal.App.4th at p. 400.  Italics added.)

Webb fails to establish an abuse of discretion or a violation of due process.

B.  Restitution

Section 1202.4, subdivision (f) requires the trial court to order the defendant to pay restitution based on the victim's loss.  (§ 1202.4, subd. (f)(1).)  Although restitution orders are generally limited to the victim's economic losses, under section 1202.4, subdivision (f)(3)(F), victim restitution shall also be ordered for "[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288."

Unlike economic damages, which are concerned with "objectively verifiable monetary losses" (Civ. Code, § 1431.2, subd. (b)(1)), noneconomic damages relate to "subjective, nonmonetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." (Civ. Code, § 1431.2, subd. (b)(2); see *People v. Smith* (2011) 198 Cal.App.4th 415, 431 (*Smith*).)

The court awarded $50,000 in noneconomic victim restitution under section 1202.4, subdivision (f)(3)(F).  Webb contends the restitution order must be stricken because (1) the court, rather than the jury, found that Jane suffers from psychological harm and (2) the finding was not supported by sufficient evidence.  We disagree.

1.  Findings By Court Rather Than Jury

In *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that *increases the penalty* for a crime *beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt."  (*Id.* at p. 490, italics added; see also *Blakely v. Washington* (2004) 542 U.S. 296, 303 [statutory maximum is the maximum sentence a judge may impose based on the facts reflected in the jury verdict or admitted by the defendant]; *Southern Union Company v. United States* (2012) 567 U.S. ___, 132 S.Ct. 2344, 2348–2349 [*Apprendi* principles apply to a criminal fine].)

Thus, to be subject to *Apprendi* and the requirements of a jury trial and proof beyond a reasonable doubt, the noneconomic restitution award under section 1202.4 would have to (1) increase a penalty for a crime—that is, constitute punishment, *and* (2) increase that penalty beyond a statutory maximum. Neither requirement is met.

### a. Not Punishment

Restitution *fines* have been held to be punishment subject to constitutional protections. (*People v. Souza* (2012) 54 Cal.4th 90, 143.) But direct victim restitution under section 1202.4 is civil in nature: its primary purpose is to compensate the victim for losses. As such, direct victim restitution is not punishment for a crime, and *Apprendi* does not apply. (See, e.g., *People v. Harvest* (2000) 84 Cal.App.4th 641, 648–649; *People v. Millard* (2009) 175 Cal.App.4th 7, 35–36; *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1183–1184; *People v. Pangan* (2013) 213 Cal.App.4th 574, 585.)

Webb points out that *Chappelone, Millard*, and *Pangan* all pertain to *economic* victim restitution. In Webb's view, *noneconomic* restitution should be considered criminal punishment because it carries a primarily punitive purpose, the amount of such restitution turns on factors like the duration or severity of the underlying crime, and there is "literally no limit" to the amount of restitution that may be imposed for noneconomic losses.

Webb's argument is unpersuasive. In light of the very nature of the term "restitution," both types of direct victim restitution—economic and noneconomic— merely compensate the victim for the loss that he or she has suffered; making a victim whole is distinct from punishment for a crime.[4]

---

[4] Webb and respondent both acknowledge *Smith, supra,* 198 Cal.App.4th 415. It is true that the court in *Smith* found no basis for distinguishing restitution based on economic loss and restitution based on noneconomic loss. But the point in *Smith* was that a restitution proceeding is a sentencing hearing rather than a civil trial, so a victim restitution order for noneconomic damages does not give rise to a right to a jury trial under the California Constitution. (*Id*. at pp. 433–434.) *Smith* does not hold that noneconomic victim restitution is not criminal punishment for purposes of *Apprendi*.

### b. No Statutory Maximum

Webb urges that the $50,000 restitution order exceeded the statutory maximum of reimbursement, because restitution is authorized only up to the victim's actual loss. (§ 1202.4, subd. (f).) As explained *post*, however, the court's award did not exceed Jane's actual noneconomic loss, since the amount awarded was within the court's discretion in quantifying that loss. Moreover, as Webb concedes elsewhere in his argument, section 1202.4, subdivision (f)(3)(F) sets forth "literally no limit" for noneconomic restitution or any stated maximum amount. Thus, whether or not noneconomic restitution constitutes criminal punishment, there can be no *Apprendi* violation for imposing noneconomic restitution above a statutory maximum, since there is no statutory maximum. (See *Southern Union Co.*, *supra*, 132 S.Ct. 2344, 2353 [there can "be [no] *Apprendi* violation where no [statutory] maximum is prescribed"].) Webb fails to demonstrate error.

### 2. Sufficiency of the Evidence

Webb next contends the $50,000 restitution order for noneconomic loss must be stricken because there was no evidence that Jane suffered physical pain or psychological harm. Not so.

### a. Court's Ruling

At the restitution hearing on October 17, 2014, the prosecutor claimed that Jane's "terrified" demeanor at trial was evidence that she remembered the incident. The prosecutor further argued that a $200,000 award was appropriate, since the incidents would "leave a mark on her forever."

The trial court disagreed, finding that Jane did not appear to be terrified or even to recall what had happened, and it would therefore be speculative to conclude that Jane had suffered psychological harm. However, the court found, Jane incurred pain and suffering during the spanking and penetration incident on July 4, in light of the photos showing redness on her buttocks and Dr. Rice's testimony that a three year old would likely experience quite a bit of pain from the digital penetration of her vagina. On that basis, the court ordered $50,000 in noneconomic restitution. The court stated: "And instead of

$200,000 on pain and suffering in this case, recognizing it was one victim, one three year old, and one day, I will say that the pain and suffering restitution should be $50,000 and no higher."

### b. Standard of Review

An award of victim restitution for *economic* loss is reviewed for an abuse of discretion. (*People v. Giordano* (2007) 42 Cal.4th 644, 663–665.) While a court has broad discretion to choose a method for calculating the restitution amount, the court "must use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious." (*People v. Thygesen* (1999) 69 Cal.App.4th 988, 992.) Webb contends the abuse of discretion standard applies here.

An award of victim restitution for *noneconomic* loss, however, has been held to require a more lenient standard of review, because the trial court's determination of the amount of the award is more subjective, akin to a jury's award of damages in a civil case. (*Smith, supra*, 198 Cal.App.4th at pp. 436–437.) Thus, the award will be affirmed if it "does not, at first blush, shock the conscience or suggest passion, prejudice or corruption on the part of the trial court." (*Id.* at p. 436.)

Webb contends that *Smith* is wrong; respondent urges that *Smith* is correct. We need not resolve the debate, because under either standard, ample evidence supported the requisite finding.

### c. Analysis

Given the evidence summarized *ante*, the $50,000 award for noneconomic damages does not "shock the conscience or suggest passion, prejudice or corruption on the part of the trial court." (*Smith, supra*, 198 Cal.App.4th 415, 436; see *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 614–615 [award for noneconomic damages does not shock the conscience unless it is "so disproportionate to the injuries suffered" that it "virtually compels the conclusion the award is attributable to passion or prejudice"].) Nor is it so arbitrary, capricious, or irrational as to constitute a prejudicial abuse of discretion.

Webb provides several reasons he thinks the amount of restitution is too high: Jane denied in an interview that Webb had inappropriately touched her (except for an

uncharged "whoopin'" she did not like) ; there is no way to know for sure if Jane actually experienced pain when Webb inserted his adult hand up to the second knuckle into her vagina (since Dr. Rice testified only that a three year old would "typically" experience such pain); the pain Jane experienced from the spanking was no worse than the pain experienced by any three year old who is spanked; although Dr. Rice opined that behavioral changes (like Jane's bedwetting and difficulty sleeping) are common in young children who have been traumatized, Jane could have been traumatized by something besides Webb's digital penetration and spanking; and the victim in *Smith* received $50,000 per year of abuse, not per day (or for an incident lasting roughly four minutes).

While these arguments might be appropriately made in the trial court, they do not establish an abuse of discretion or shock the conscience on appeal. Webb fails to show that the court's finding was not an unreasonable inference from the evidence. And the fact that the trial court in *Smith* did not abuse its discretion in awarding one amount of restitution based on the facts in that case, does not mean that the trial court here abused its discretion in awarding another amount based on the facts in this case.

Webb fails to demonstrate error.

### III. DISPOSITION

The judgment is affirmed.

_____

NEEDHAM, J.

We concur.

_____

JONES, P.J.

_____

SIMONS, J.