Filed 10/14/20  P. v. Dennis CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B301300 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. A709481-02) |
| v. | |
| CLAYBORNE DENNIS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, David W. Stuart, Judge.  Reversed and remanded with directions.

Case Law Ltd. and Jeffrey L. Mendelman for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Charles S. Lee and Paul S. Thies, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

## INTRODUCTION

Clayborne Dennis appeals an order denying his petition for resentencing under Penal Code[1] section 1170.95. We must decide how to apply section 1170.95 to a petitioner who pleaded guilty to second degree murder, as Dennis alleges, under a theory of natural and probable consequences. Unlike almost every other case that has expounded on how to apply section 1170.95, this case involves a plea of guilty. Thus, there are no trial transcripts, jury instructions, verdict forms, or pre-trial motions to assist us in discerning under what exact theory the People prosecuted Dennis or under what theory his counsel advised him to plead guilty to second degree murder, as Dennis ultimately did. The trial court concluded Dennis pleaded guilty on a theory of implied malice and therefore did not make a prima facie showing that he was entitled to relief. Because it is by no means reasonably ascertainable from the plea colloquy, taken in conjunction with the preliminary hearing transcript, that Dennis necessarily pleaded guilty under a theory of implied malice, we reverse. We return this petition to the trial court with directions to hold an evidentiary hearing under section 1170.95, subdivision (d).

---

[1] All further undesignated statutory references are to the Penal Code.

## QUESTION PRESENTED

By Information dated March 8, 1988, the People charged Dennis and co-defendant Juan Carlos Moran with first degree murder. At the defendants' preliminary hearing, the People presented evidence that Dennis, Moran, and several others charged as juveniles kicked and beat the victim Melvin Reaves several times in the head and torso. The victim ultimately died from blunt force head injuries sustained in the attack. The coroner was unable to say which particular blow killed the victim. Although held to answer to the charge of first degree murder, Dennis ultimately entered a plea of guilty to second degree murder, as did co-defendant Moran.

The question presented is whether Dennis made a prima facie showing that he is "entitled to relief" under section 1170.95, subdivision (c), and is therefore entitled to an evidentiary hearing where the People would have the burden of proving beyond a reasonable doubt that Dennis in ineligible for resentencing.

## STANDARD OF REVIEW

Our review of the trial court's interpretation of Senate Bill No. 1437 is independent. (*People v. Verdugo* (2020) 44 Cal.App.5th 320, 328, fn. 8, review granted March 18, 2020, S260493 (*Verdugo*).)

## FACTUAL AND PROCEDURAL BACKGROUND

These facts are from the preliminary hearing. Some of the facts conflict. We do not assess witness credibility or evaluate the truth of the testimony.

Three relevant witnesses testified: an eyewitness, a detective who interviewed Dennis, and a medical examiner. Eyewitness Helen Flores testified that on August 17, 1987, Dennis and six others surrounded Reaves in a parking lot. While Reaves was prone, Dennis "sock[ed]" him in the face once. A member of the group touched the victim's neck and said, "Hey, you guys better quit it because this guy's pulse is weak." Fifteen minutes later, the witness returned and saw Reaves on the ground, stripped of clothing. Dennis was in the area but not near Reaves. The witness saw Phillip Torrez kick the victim in the leg or groin. The witness did not see Dennis do anything to Reaves this second time.

The detective, William Caughey, testified about his August 20, 1987 interview of Dennis. Dennis said he had been standing outside the apartment building with Ricky Martinez when Martinez hit Reaves. Dennis and Martinez chased Reaves. A third person, Juan Moran, joined Dennis and Martinez in pursuit of Reaves. Dennis struck Reaves twice: a punch while Reaves was standing and a kick while Reaves was on the ground. Moran kicked Reaves five or six times and Martinez kicked Reaves three or four times. The three left and returned with others.

On cross-examination, the detective said Sammy Martinez said he saw Dennis "kick [Reaves] in the face and blood [came] out of his mouth." Sammy Martinez tried to shake Reaves to wake him but Reaves would not move.

Dennis's counsel challenged the detective's testimony about Sammy Martinez as hearsay. The court ruled the objection was untimely and said the information would be received "with the consideration that it is hearsay."

4

Reaves died at the scene. A medical examiner concluded Reaves died from brain damage caused by blunt force head injuries. The examiner counted over a dozen "abrasions and contusions" on Reaves's head and neck area and over a dozen "body-type" injuries. Because there were so many injuries to his head and face, it was not possible to associate Reaves's brain damage with any one injury.

At the preliminary hearing, the prosecution explained its theory: "I think what we heard here is evidence of a savage beating that these two defendants took part in. They ran [Reaves] down, they beat him and kicked him, and after they did that they went and got others to participate as well. I think there is ample evidence here to hold both defendants to answer for murder." The court did so.

On June 27, 1988, Dennis changed his plea. The prosecutor asked, "Is it your desire to withdraw your not guilty plea and plead guilty to second degree murder?" Dennis said yes. Below is the portion of the plea colloquy pertinent to our analysis. The prosecutor is Mr. Nison and Dennis's counsel is Mr. Goldsobel. The italics are ours.

> "Mr. Nison: And you are pleading guilty freely and voluntarily and because you are, in fact, guilty of the offense charged, that being on August 17th of 1987 in the county of Los Angeles you did commit the crime of second degree murder in that you did willfully, unlawfully, and *with malice aforethought* murder Melvin Reaves, R-E-A-V-E-S, a human being?
>
> "Mr. Goldsobel: Before my client answers the question, Your Honor, I'd like to explain to Mr. Nison and to the defendant that I have explained to him what the law

is as far as his participation and his guilt that comes from it, that he is only one of several—not several—many people that participated but that doesn't diminish his responsibility and *because of his participation he is, in fact, liable for guilt on a conviction for murder of the second degree.*

"Do you understand that?

"Defendant Dennis:  Yes

"Mr. Goldsobel:  Now, based on what I said, do you understand what Mr. Nison said now?  He's asking you if you're guilty of the crime.

"Mr. Nison:  Further, Mr. Dennis, I want to inform you that it is not necessary that you intended that the victim die.  *It is just merely necessary* that you intended to do some act which—and this is a shorthand — if you have any questions, you can ask me or ask your attorney—you *intended to do some act which even if you didn't intend that it result in death that it was the type of act that would likely result in death.*

"Do you understand that?

"Defendant Dennis:  Yes.

"Mr. Nison:  And is that why you are changing your plea to guilty?

"Defendant Dennis:  Yes."

After that, the prosecutor asked Dennis, "to a charge of murder, violation of Penal Code section 187, murder in the second degree, in felony Information A709481, what is your plea?"  Dennis responded, "Guilty."  In December 1988, the court sentenced Dennis to 15 years to life in prison.

On January 25, 2019, Dennis filed a petition for resentencing under section 1170.95, which had just become effective January 1, 2019, as a result of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). After Dennis filed his petition for resentencing, the trial court appointed counsel and ordered briefing by both parties. The court heard the matter on September 6, 2019. Dennis's counsel described the facts from the preliminary hearing. He said Dennis "sock[ed]" the victim just one time and, based on the medical examiner's statements, that could not have been the actual cause of Reaves's death. Dennis's attorney said the prosecution could have proven murder only based on the natural and probable consequences doctrine. The prosecution denied reliance on the natural and probable consequences theory and argued Dennis acted with implied malice.

The trial court explained Senate Bill 1437 eliminated the natural and probable consequence doctrine of liability for separate crimes based on committing a "target" crime, but did not eliminate implied malice. The court said Dennis's case "is a direct participation implied malice case, and it has always been that." The judge quoted the plea colloquy where Dennis said he understood he had to have intended to do an act likely to result in death. The court said a reasonable jury could have found Dennis's act of "socking Reaves in the face while Reaves was on the ground dangerous to human life. Dennis accepted the plea deal on an implied malice theory, the court reasoned, which established the requisite malice aforethought for murder. The court concluded Dennis failed to make a prima facie case for resentencing because Dennis pleaded guilty under a theory

7

Senate Bill 1437 did not eliminate.  The petition for resentencing was denied.

Dennis timely appealed.

## DISCUSSION

### I.    The Ultimate Theory of Prosecution for Murder Was Under Either a Theory of Implied Malice or the Natural and Probable Consequences Doctrine.

Traditionally, a defendant is culpable for murder when either the defendant or an accomplice proximately causes an unlawful death and the defendant personally acts with malice aforethought.  First degree murder is committed with malice aforethought, but with the additional elements of willfulness premeditation and deliberation.  (*People v. Knoller* (2007) 41 Cal.4th 139, 151 (*Knoller*).)  Second degree murder requires malice aforethought, but without the additional elements that would support a conviction for first degree murder.  (*Ibid.*)

Malice may be express or implied.  Express malice requires an intent to kill, but implied malice does not.  (*People v. Soto* (2018) 4 Cal.5th 968, 970.)  Prior to Senate Bill 1437, a defendant could nonetheless be convicted of murder without proof of express or implied malice by resort to the theory of felony murder (which is not implicated here so we do not address it) and the natural and probable consequences doctrine (which we discuss next).  (*People v. Chiu* (2014) 59 Cal.4th 155, 161 (*Chiu*).)

This case requires us to decide whether Dennis was necessarily convicted of second degree murder on the implied malice theory or whether the conviction invoked the natural and probable consequences doctrine of liability?  These two "no-intent-to-kill" murder theories can be confusing because both doctrines use the phrase "natural and probable consequences."

One doctrine is about direct liability, meaning the presence of another criminal actor is legally irrelevant. The other doctrine is about aiding and abetting, which means the presence of another criminal actor is essential.

The first doctrine about direct liability is "implied malice" or "conscious disregard for life" murder. (CALCRIM No. 520 [a defendant is guilty of murder if the defendant committed an act causing the death of another, the "natural and probable consequences" of the act were dangerous to human life; the defendant committed the act knowing it was dangerous to human life; and the defendant deliberately acted with conscious disregard for human life]; see generally *People v. Blakeley* (2000) 23 Cal.4th 82, 87.) The cases sometimes call this mental state "conscious disregard for life." (*Ibid.*) Thus, malice is implied when the killing is proximately caused by an act deliberately performed by a person who knows that this conduct endangers the life of another and who acts with conscious disregard for life. (*People v. Smith* (2018) 4 Cal.5th 1134, 1165.) A second degree murder conviction on a theory of implied malice requires proof that a defendant acted with conscious disregard of the danger to human life. A defendant's conscious disregard of the risk of serious bodily injury alone does not suffice to sustain such a conviction. (*Knoller*, *supra*, 41 Cal.4th at p. 156.)

The second and separate murder doctrine does not require malice; it is the "natural and probable consequences" doctrine for indirect liability of an aider and abettor. (CALCRIM No. 402; see generally *Chiu, supra,* 59 Cal.4th at p. 161; *Chiu*, at pp. 171–172 (conc. & dis. opn. of Kennard, J.) [indirect liability of the aider and abettor under the natural and probable consequences doctrine requires a five-step process: the jury must find that the

9

defendant (1) with knowledge of a confederate's unlawful purpose; (2) with the intent of committing, encouraging, or facilitating the commission of any target crimes; (3) aided, promoted, encouraged, or instigated the commission of the target crimes; (4) the defendant's confederate committed an offense other than the target crimes; and (5) the offense committed by the confederate was a natural and probable consequence of the target crimes that the defendant encouraged or facilitated].)  The natural and probable consequences doctrine imposes liability for criminal harms the defendant naturally, probably, and foreseeably put in motion.  The doctrine is not an implied malice theory; the means rea of the aider and abettor with respect to the murder or attempted murder is irrelevant.  (*People v. Lee* (2020) 49 Cal.App.5th 254, 261, review granted July 15, 2020, S262459 (*Lee*).)

The amendments enacted by Senate Bill No. 1437 eliminated liability for murder under the natural and probable consequences doctrine.  It did so by amending section 188, which now provides, "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)  In short, after Senate Bill No. 1437, a defendant cannot be convicted of murder absent a showing of malice, with the exception (inapplicable here) of felony murder as limited by section 189, subdivision (e).  (*Lee, supra,* 49 Cal.App.5th at p. 262, review granted July 15, 2020, S262459.)

As relevant here, the import of the amendments to section 188 is that malice may no longer be "imputed" solely from the objective fact that the person participated in a crime during

10

which a foreseeable killing occurred, as was permitted under the natural and probable consequences doctrine.  Senate Bill 1437 did not redefine the elements of malice; it merely changes the circumstances under which a person could be convicted of murder without a showing of malice.

More specifically the Legislature itself has stated that by amending sections 188 (defining malice) and 189 (defining the degree of murder), Senate Bill 1437 changed the "felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)  (Because only the natural and probable consequences doctrine is at issue here, we omit further reference to the theory of felony murder.)

When the Legislature decided to abolish the natural and probable consequences doctrine as a basis for liability for murder, it provided a specific procedure by which to examine prior murder convictions to determine if a defendant was convicted of murder under that doctrine and whether he could be convicted of murder after elimination of the doctrine.  (§ 1170.95.)  The procedure is relatively straightforward.  Section 1170.95 allows a felon convicted of murder under the natural and probable consequences doctrine, to "file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts when all of the following conditions apply:  [¶] "(1) A complaint, information or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory

11

of felony murder or murder under the natural and probable consequences doctrine.  [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted of first degree or second degree murder.  [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a).)  The petition must contain basic identifying information and be filed with the court that sentenced the petitioner.  (*Id.*, subd. (b)(1).)

Once the petition is properly filed, the trial court's review begins.  First, section 1170.95, subdivision (b)(2) provides that the trial court may deny the petition without prejudice if any of the information required by subdivision (b)(1) is missing and cannot be readily ascertained by the court.

After a petition has been filed that includes all required information, step two is set out in section 1170.95, subdivision (c).  "The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls *within the provisions of this section*.  If the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner.  The prosecutor shall file and serve a response within 60 days of service of the petition and the petitioner may file and serve a reply within 30 days after the prosecutor response is served. . . . If the petitioner makes a prima facie showing that he or she is *entitled to relief*, the court shall issue an order to show cause." (§ 1170.95, subd. (c), italics added.)  Thus, subdivision (c) compels the resentencing court to make two prima facie determinations.  The first is whether petitioner has made a prima facie showing that he or she falls within the provisions of

12

the section.  If that showing is made, the trial court then appoints counsel and orders briefing.  After briefing, the trial court rules on the second prima facie showing that petitioner must make, to wit, that he or she is entitled to relief under the statute.

If the second prima facie showing has been made, the court issues an order to show cause (OSC) and sets up an evidentiary hearing where the burden is on the People to show beyond a reasonable doubt that the petitioner is ineligible for resentencing.  At that evidentiary stage, the prosecutor and the petitioner "may rely on the record of conviction or offer new or additional evidence to meet their respective burdens."  (§ 1170.95, subd. (d)(3).)

Thus, section 1170.95, subdivision (c) describes a chronological sequence of actions.  This sequence includes two stages in which the court reviews a "prima facie showing—one review takes place before briefing and one after.  Before briefing, the court determines that the petitioner has made a prima facie showing that he "falls within the provisions" of the statute.  This initial review thus determines the facial sufficiency of the petition.  (*Verdugo, supra,* 44 Cal.App.5th at pp. 327–328, review granted March 18, 2020, S260493.)  The court's role at this stage is simply to decide whether the petitioner is ineligible for relief as a matter of law, making all factual inferences in favor of the petitioner.  (*Id.* at p. 329.)  If the petition is facially sufficient, the second review occurs after appointment of counsel and submission of written briefs.  Here the court determines whether petitioner has made a prima facie showing that he or she is entitled to relief.  (*People v. Lewis* (2020) 43 Cal.App.5th 1128, 1140, review granted March 18, 2020, S260598.)  This second review is at issue in this appeal.

13

Before the evidentiary hearing described in section 1170.95, subdivision (d), the trial court should not evaluate the credibility of the petitioner's assertions, but it need not credit factual assertions that are untrue as a matter of law.  (*People v. Drayton* (2020) 47 Cal.App.5th 965, 980.)  The authority to make determinations without conducting an evidentiary hearing pursuant to section 1170.95, subdivision (d) is limited to readily ascertainable facts from the record (such as the crime of conviction) rather than factfinding involving the weighing of evidence or the exercise of discretion, such as determining whether the petitioner showed reckless indifference to human life in the commission of the crime.  (*Drayton*, at p. 980.)  The court need not credit factual assertions that are untrue as a matter of law—for example, a petitioner's assertion that a particular conviction is eligible for relief where section 1170.95 does not list the crime as eligible.  Just as in habeas corpus, if the record contains facts refuting the allegations made in the petition, the court is justified in making a determination adverse to the petitioner.  Thus, at any stage prior to the evidentiary hearing in subdivision (d), the information the trial court may rely upon is limited to that which is readily ascertainable from the record of conviction.

Here the trial court denied the petition at the second stage of review, after finding that Dennis had not made a prima facie showing that he was entitled to relief.  The trial court erred because it engaged in factfinding on disputable facts instead of issuing an OSC and holding an evidentiary hearing.

II.    **Petitioner Made a Prima Facie Showing That the Information Permitted Conviction under the Natural and Probable Consequences Doctrine.**

Dennis's burden at the second subdivision (c) stage was to make a prima facie showing of three qualifying factors that established he is eligible for relief under the statute.  Prima facie evidence is that which suffices for the proof of a particular fact, until contradicted and overcome by other evidence.  Prima facie evidence is not conclusive evidence; it simply denotes that the evidence may suffice as proof of fact until or unless contradicted and overcome by other evidence.  (*Estate of Woodson* (1939) 36 Cal.App.2d 77, 80.)  "Normally . . . a 'prima facie showing' connotes an evidentiary showing that is made without regard to credibility. . . .  [¶]  This is particularly true when [as here] the prima facie showing merely triggers an evidentiary hearing, at which any necessary credibility determinations can still be made."  (*People v. Johnson* (2015) 242 Cal.App.4th 1155, 1163.)

In determining whether a party has made a prima facie showing, " 'the court may not weigh the evidence or consider the credibility of witnesses.  Instead, the evidence most favorable to [the party] must be accepted as true and conflicting evidence must be disregarded.  The court must give "to the [party's] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in [the party's] favor . . . ." ' "  (*Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1086.)  "Prima facie evidence . . . may be slight evidence which creates a reasonable inference of fact sought to be established but need not eliminate all contrary inferences."  (*Evans v. Paye* (1995) 32 Cal.App.4th 265, 280–281, fn. 13, and authorities therein cited; see *Jenni Rivera*

15

*Enterprises, LLC v. Latin World Entertainment Holdings, Inc.* (2019) 36 Cal.App.5th 766, 781.) This is so even if there could be other inferences as well. (*Reaugh v. Cudahy Packing Co.* (1922) 189 Cal. 335, 339.)

We conclude Dennis made a prima facie showing of the three factors required to proceed to evidentiary hearing under the statute.

Section 1170.95, subdivision (a)(1) first requires a showing that an Information was filed against the petitioner "that allowed the prosecution to proceed . . . under the natural and probable consequences doctrine."

Here the Information in the record on appeal alleges that Moran and Dennis "did willfully, unlawfully and with malice aforethought murder Melvin Reaves." "[I]t has long been the law in this state that an accusatory pleading charging murder need not specify degree or the manner in which the murder was committed. . . . So long as the information adequately alleges murder, the evidence adduced at the preliminary hearing will adequately inform the defendant of the prosecution's theory regarding the manner and degree of killing." (*People v. Thomas* (1987) 43 Cal.3d 818, 829, fn. 5.) Two defendants are charged in the Information and so Dennis could have been an aider and abettor and Moran the actual killer. There are no enhancements which allege Dennis personally inflicted injury or death on the victim. Thus, the Information satisfies the first requirement of the statute: it allowed the prosecutor to proceed under the natural and probable consequences doctrine with Dennis as Moran's aider and abettor.

16

We note in this regard the record does not reflect if the Information was amended when Dennis entered his guilty plea to second degree murder. All we have is the prosecutor's statement to Dennis that he did not need to admit that he intended to kill the victim. And Dennis made no such admission. At worst, then, Dennis pled guilty to second degree murder under either a theory of implied malice or natural and probable consequences doctrine.

To the extent the People suggest that the use of the term "malice aforethought" in the charging allegation meant that Dennis was being charged with personally harboring malice and so with directly committing the murder, the People are mistaken. An allegation that the murder was committed "willfully, unlawfully and with malice aforethought" traditionally "describes the offense of murder in the language of our statute, and is in accord with a form approved over and over again by this court." (*People v. Witt* (1915) 170 Cal. 104, 107.) "[I]t must be accepted as the settled law of this state that it is sufficient to charge the offense of murder in the language of the statute defining it, whatever the circumstances of the particular case," including felony murder. (*Id.* at pp. 107–108; *People v. Watkins* (1987) 195 Cal.App.3d 258, 265.) Indeed, "[m]odern pleading rules in this state make a general charge of murder sufficient to encompass first and second degree murder, voluntary and involuntary manslaughter, and felony murder." (*People v. Lucas* (1997) 55 Cal.App.4th 721, 737.)

17

III. **The Plea Colloquy Does Not Show That Dennis Was Necessarily Convicted Without Reliance on the Natural and Probable Consequences Doctrine.**

Dennis next must show prima facie that he pleaded guilty to murder because he could have been convicted at trial under the natural and probable consequences doctrine. (§ 1170.95, subd. (a)(2).) In this regard, let's examine the plea colloquy. The prosecutor stated at the plea colloquy that "[a]fter reviewing the file and all of the evidence that is in my possession at this time, I believe that a trial would—there would be a likely result of a second degree murder. That at this point[,] the evidence would point towards that being an appropriate disposition of that being the actual crime which occurred." This suggests that either the prosecutor believed some of the evidence at the preliminary hearing might in support of first degree murder not be available or credible at trial or that the prosecutor had come into possession of evidence since the preliminary hearing that undermined the People's original theory of first degree murder.

Before Dennis pled guilty, the prosecutor asked him if he was "pleading guilty freely and voluntarily and because you are, in fact, guilty of the offense charged, that being . . . you did commit the crime of second degree murder in that you did willfully, unlawfully and with malice aforethought murder Melvin Reaves." Dennis did not respond to the prosecutor's question. Before Dennis could say anything, his counsel interjected that he had "explained to [Dennis] what the law is as far as his participation and his guilt that comes from it, that he is only one of several— not several—many people that participated but that doesn't diminish his responsibility and because of his participation he is in fact liable for guilt on a conviction for

18

murder of the second degree." The prosecutor added: "Further, Mr. Dennis, I want to inform you that it is not necessary that you intended . . . to do some act which—and this is a shorthand—if you have any questions, you can ask me or your attorney—you intended to do some act which even if you didn't intend that it result in death that it was the type of act that would likely result in death."

The court then reminded the prosecutor that he had not actually taken Dennis's plea. The prosecutor rephrased his question and simply asked Dennis how he pled to a charge of "murder in the second degree, in felony Information A709481." As we note above, there is no indication as to whether or how the Information was amended to reflect a charge of second degree murder, and the prosecutor did not repeat the "willfully, unlawfully and with malice aforethought" language as part of his second inquiry. Thus, there is no basis to conclude from the prosecutor's one-time use of "malice aforethought" that Dennis admitted that he personally acted with "malice aforethought." Without an admission to harboring malice, it can be inferred Dennis pled guilty under the natural and probable consequences doctrine.

The trial court apparently believed Dennis pled guilty to second degree murder on an implied malice theory because Dennis stated he understood the prosecutor's comments that he was guilty if he "intended to do some act which, even if you didn't intend that it result in death." The trial court stated "Mr. Dennis chose to accept this case settlement based on this implied malice theory." The transcript shows, however, that Dennis stated that he understood what the prosecutor was saying, not that he agreed with or admitted that he had committed such an act.

19

Dennis's counsel had just finished reminding Dennis that he could be liable for murder based on his participation with others in unspecified acts. The plea colloquy does not directly show which of those two theories Dennis believed he was agreeing to when he entered his guilty plea. Whether he accepted his counsel's advice that he was guilty of murder based on his participation in the beating would be an appropriate issue to explore at an evidentiary hearing. And if he did accept and plead on that advice of counsel, then his plea now likely would not stand under an implied malice theory because the statute says malice cannot be presumed from participation alone.

Generally, when determining whether there is a factual basis for a plea and what it is, the discussion of the defendant with his counsel is determinative. (See *People v. Palmer* (2013) 58 Cal.4th 110, 118 [" 'While defendant may not be in a position to recognize whether his acts do or do not " 'constitute the offense with which he is charged' " . . .' . . . the trial court may satisfy its statutory duty [to inquire about the factual basis for a plea] by accepting a stipulation from counsel that a factual basis for the plea exists . . . where, as here, the plea colloquy reveals that the defendant has discussed the elements of the crime and any defenses with his or her counsel and is satisfied with counsel's advice."].) Thus, the factual basis for the plea, based on Dennis's counsel's statements during the plea colloquy, would be that he participated in unspecified acts with others and was liable because of that participation. Counsel's statement suggests that Dennis believed others were more responsible for the killing than he was. This is much closer to liability under the natural and probable consequences doctrine than it is to liability as a direct participant in the killing. It suggests Dennis's plea was based on

20

the natural and probable consequences theory, even if there may be other inferences.  It satisfies his burden of showing a prima facie case for relief.

Further, even if Dennis did agree he intended to do an act "that was the type of act that would likely result in death" that intent is only one part of the requirement for implied malice.  Implied malice also requires that a defendant know that the conduct endangers the life of another and act with a conscious disregard for life.  (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)  Malice "is a mental state that must be formed *before* the act that causes death is committed."  (CALCRIM No. 520, italics added.)  The prosecutor's advisement did not convey to Dennis that he must have been aware before he performed the act that it was likely to result in death.  Dennis may simply have been agreeing that in retrospect the act was dangerous.  Hindsight may be 20/20, but it is not a basis for a finding of malice.

The trial court also appeared to accept as true that someone who does an act that is likely to result in death must necessarily be aware of that danger.  That is not the law.  A jury might be able to infer such awareness from the circumstances of the act and the defendant's life history, but this case does not involve a jury determination that Dennis was aware of the danger and acted anyway.  Further, there are no facts in the plea colloquy which would permit a court to characterize this as a "readily ascertainable" determination.  Defense counsel explained his reasons for advising the defendant why he was guilty; at most, the prosecutor arguably laid out another inference that could have been made.  But in determining whether a prima facie case has been made, inferences are to be made in favor of, not against, the party with the burden.  In this case that is Dennis.

21

The trial court suggested that the words spoken during the plea colloquy do not invoke or imply the natural and probable consequences theory.  There is absolutely no requirement that a plea colloquy spell out the theory of liability under which defendant is pleading guilty.  Nevertheless, Dennis's counsel's discussion of his client's participation in the assault on Reaves suggests the natural and probable consequences doctrine: "[M]any people participated but that doesn't diminish his responsibility and *because of his participation he is, in fact, liable for guilty on a conviction for murder of the second degree.*"  (Italics added.)  The amendments to section 188 which eliminate the natural and probable consequences doctrine do not expressly refer to that doctrine, but rather state:  "Malice shall not be imputed to a person based solely on his or her participation in a crime."  (§188, subd. (a)(3).)  If Dennis intended to and did only intend to participate in a simple assault (the non-target offense), under the natural and probable consequences doctrine, Dennis would be guilty of murder *because of his participation* in the group assault, notwithstanding the absence of an intent to kill.

Further, the prosecutor's statement about the required act is very broad.  The prosecutor did not identify any specific act committed by Dennis.  The prosecutor did state that he was using "shorthand" but did not specify what the shorthand was for.  His shorthand is not incompatible with the natural and probable consequences doctrine, which provides that a "nontarget offense is a ' "natural and probable consequence" ' of the target offense if, judged objectively, the additional offense was reasonably foreseeable.  [Citation.]  The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense." (*Chiu, supra*, 59 Cal.4th at pp. 161–162.)  It is possible Dennis

could have "understood" that his act of participating in a group assault was likely to result in death because it was objectively foreseeable that someone would hit the victim hard enough to kill him, but not have understood or agreed that he actually foresaw this danger at the time of the assault. This would be a classic formulation of the natural and probable consequences doctrine, as opposed to the doctrine of implied malice, which, as discussed, requires awareness and conscious disregard of the risk of death.

In his petition, Dennis averred that he pled guilty because he could be convicted under the natural and probable consequences doctrine. The plea colloquy does not show that Dennis admitted to harboring implied malice. Instead, it permits the inference that he pleaded guilty because he believed he could have been convicted under the natural and probable consequences doctrine based solely on his participation in the assault. And, as set out in the next section, the evidence presented at the preliminary hearing supports the same inference.

IV. **The Preliminary Hearing Supports the Inference that Dennis Could Not Be Convicted of Murder on These Facts Without Reliance on the Natural and Probable Consequences Doctrine.**

The last prima facie showing Dennis had to make is that he "could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(3).) That means his participation in the crime alone cannot support a finding of malice. Our review of the preliminary hearing transcript persuades us Dennis has made that prima facie showing.

23

The trial court relied on the preliminary hearing transcript to show that Dennis committed acts which he knew were dangerous to human life and so could have been convicted as a direct participant in the killing under a theory of implied malice without reliance on the natural and probable consequences doctrine. This is the type of factfinding that is not permitted in connection with the second prima facie determination. Dennis's knowledge and intent, absent perhaps a clear and direct admission at the plea colloquy, is not a readily ascertainable fact. And drawing such an unfavorable inference from the evidence is disallowed when considering whether a prima facie case has been made.

But assuming such reliance on disputable facts in the preliminary hearing transcript is allowed, we still conclude trial court's reliance is unavailing.

There are two sets of relevant testimony in the preliminary hearing transcript: Flores's testimony that Dennis "socked" Reaves in the mouth when Reaves was lying on the ground; and Detective Caughey's testimony that Sammy Martinez said he saw Dennis kick Reaves in the face and then blood came out of Reaves's mouth; and when Martinez tried to shake Reaves, Reaves would not move. The trial court specifically noted the Flores testimony as a basis for its conclusion that a jury could find punching or socking someone when they are down dangerous to human life, supporting a finding of implied malice.

Looking to the medical expert, we note the deputy medical examiner who testified at the preliminary hearing opined that "if the [victim's] head was actually resting against the ground and a blow were struck to the mouth that would cause these lip injuries, I doubt seriously you would get this kind of a bruise on

24

the back of the head without having more mouth injuries or broken teeth or something like that." He also testified that "as to significance regarding the cause of death, the only way the mouth blow could have significance to the cause of death would be if that [blow] projected him backwards so he hit his head." As the context of this testimony makes clear, the backward projection is a reference to a hypothetical situation where the victim was not lying flat on the ground, but was in a semi-reclining position with his head above the ground so that the blow to the mouth propelled the victim's head downward and into the ground. The doctor's medical analysis leads to the conclusion that because the victim did not suffer mouth injuries or broken teeth, the blow to the victim's mouth while he was prone on the ground did not involve sufficient force to have "significance" in causing death. To the contrary, in the doctor's opinion, the blow to the mouth could only have had significance to the victim's death if the victim were not prone on the ground when the blow was struck. Flores's testimony that Dennis hit Reaves when he was prone, without more and in light of the expert's opinion, undermines the trial court's conclusion that Dennis harbored implied malice because he socked or kicked a man prone on the ground.

The other evidence from Sammy Martinez is that Dennis's kick "made blood flow" from Reaves's mouth. Martinez's statement is not consistent with the medical examiner's testimony, which found essentially minor injuries to the victim's mouth which could not have had significance to the victim's cause of death. While the medical examiner discussed the significance in terms of a punch to the mouth, the same would be true of a kick: a blow of any sort to the mouth which had sufficient force

25

to contribute to death would have resulted in more significant injuries to the mouth or teeth.

Martinez's description of what he saw is either physically impossible or, if taken as true, does not show that it was Dennis's blow which caused the blood flow. As the medical examiner explained, "[T]here aren't any truly major vessels in the lip. There are small vessels that when they get injured will bleed somewhat, but . . . it would take some time for that blood to accumulate." The medical examiner discussed bleeding in terms of lip injuries because there were no significant mouth or teeth injuries that would have been the cause of bleeding. If blood came out immediately after Dennis kicked Reaves, as Martinez described, it was because some previous blow had begun the slow process of bleeding in the mouth, not because the kick was so forceful that it caused immediate bleeding from the mouth.

Thus, the preliminary hearing testimony relied on by the trial court certainly allow the inference that Dennis's blows did not have any significance to Reaves's cause of death. Without more, the blows alone cannot serve as the basis for a finding of implied malice. We conclude Dennis's showing that he could not be convicted without reliance on the natural and probable consequences doctrine has not been rebutted as a matter of law.

## DISPOSITION

The trial court's order denying the petition is reversed.  The petition is remanded to the trial court with directions to issue an order to show cause and set an evidentiary hearing in accordance with section 1170.95, subdivision (d).

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, J.

We concur:

GRIMES, Acting P. J.

WILEY, J.

27